[No. S004611. Crim. No. 23619. Jan. 7, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
JACKSON CHAMBERS DANIELS, JR., Defendant and Appellant.

834

**COUNSEL**

John T. Philipsborn, under appointment by the Supreme Court, John G. Cotsirilos and Peter A. Leeming for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, Harley D. Mayfield, Assistant

Attorney General, Jay M. Bloom, Janelle B. Davis and Deborah D. Factor, Deputy Attorneys General, for Plaintiff and Respondent.

---

## OPINION

**BROUSSARD, J.**—Defendant Jackson Chambers Daniels, Jr., was convicted of the first degree murder of Riverside Police Officers Dennis Doty and Phil Trust. The jury found that defendant used a firearm in each murder. Defendant was also convicted of possession of cocaine, and possession of a concealable firearm by an ex-felon.

With respect to each murder, the jury found three special circumstances: "that defendant has in this proceeding been convicted of more than one offense of murder" (Pen. Code, § 190.2, subd. (a)(3));[1] "that the murder was committed for the purpose of avoiding or preventing a lawful arrest . . ." (§ 190.2, subd. (a)(5)); and intentional murder by a defendant who "knew or reasonably should have known that the victim was a peace officer engaged in the performance of his or her duties . . ." (§ 190.2, subd. (a)(7)). The jury fixed the penalty at death. This appeal is automatic.

### SUMMARY OF FACTS

Defendant was convicted of murdering two police officers who came to take him to prison after his conviction for a 1980 bank robbery had been affirmed on appeal. In the course of the bank robbery defendant had fled in a car, pursued by Officers Bulf and Creech. The bank had planted a tear gas bomb with the stolen money; when defendant's car filled with the gas he leaned out an open door. The car made a U-turn, narrowly missing Bulf, who was standing next to his patrol car. Bulf fired at the car, which spun out of control and came to a stop. Defendant got out of the car, shot at Creech, and ran. The officers fired and defendant fell. He was hit with nine bullets, one of which entered defendant's back and left him paralyzed below the waist. The officers found the proceeds of the bank robbery in the car.

Defendant pled nolo contendere to charges of bank robbery and assault on a police officer and was sentenced to 13 years' imprisonment. The court granted a stay of execution to permit an appeal. Defendant posted bail pending appeal and remained at liberty.

Defendant's conviction was affirmed by the Court of Appeal. When we denied defendant's petition for hearing, the superior court set a hearing for

---

[1] Unless otherwise indicated, all statutory citations are to the Penal Code.

April 21, 1982. When defendant did not appear at the hearing, it was continued to April 28. Defendant again did not appear, and the court issued an arrest warrant.

Defendant's uncle, who had put up the collateral for the bail, told the police that defendant was living at the house of James Cornish. On May 13, Officers Doty and Trust were assigned to go there to arrest defendant.

Alma Renee Ross, defendant's nurse, testified under immunity. She described what happened when the officers arrived. Cornish and his wife had gone to work, leaving defendant, Ross, and the Cornishes' three-year-old son in the house. Ross admitted the officers about 8:30 a.m. and took them to defendant's bedroom. Defendant was sitting on the bed, dressed only in a shirt. Ross went to his closet to get pants and shoes. When she looked back she saw defendant take a gun from between his legs. She hid in the closet and heard gunshots.

A short while later defendant called her to come out of the closet. When she did she saw defendant sitting on the floor with his back against the bed; he had a bullet wound to his right hand. Officer Doty's body was lying on the floor. Defendant picked up a gun from the floor and, with Ross's assistance, got into his wheelchair. As they left the house she saw Officer Trust, mortally wounded, kneeling on the floor of the Cornish bedroom. After defendant and Ross left the house, Trust broke the bedroom window, fired a shot to attract attention, and called for help. Two neighborhood children heard his call and went to the house of Claire Spicer, who summoned the police.

Ross drove defendant to the home of Clara Butler and her mother, Dolores Butler. Dolores saw an announcement on television about the killing, and confronted defendant. He told her, "Yes, I killed them." It was "either them or me." Clara then insisted that defendant leave.

Defendant called Claire Schall and asked her to pick him up. While they were looking for a place where defendant could stay, they heard a radio broadcast mention the killing. Defendant then said to her, "Now you know."

On May 14 defendant went to Ted Smith's house. The next morning defendant told Smith that when one of the officers went to get some clothes for him, he "saw his opportunity and took it." Defendant said that after he shot one officer, the other one shot the gun out of his hand. Defendant fell to the floor, got the first officer's gun, and shot the other policeman.

The police investigation showed that Doty had been shot three times with an unidentified gun; Trust had been shot six times, mostly with Doty's gun. Investigators also determined that Trust had fired four bullets from his gun. Three were recovered in the house; the fourth was in defendant's hand. The search of the house also turned up cocaine in both defendant's bedroom and in the Cornishes' bedroom.

At the trial police investigators attempted to reconstruct the gunfight from the location and trajectory of the bullets. They theorized that when defendant and Trust exchanged gunfire defendant was lying on the bedroom floor, shooting around the bedroom door. Trust was in the hallway between the two bedrooms. After he was hit Trust retreated to the Cornish bedroom.

The defense argued that it would be extremely difficult for defendant, after having been shot in the hand by Officer Trust, to get off the bed, take the gun from Officer Doty, and shoot Trust. Dr. Mortimer Moore offered an alternative reconstruction of the shooting differing from that of the prosecution experts. Dr. Floyd Brallier, a hand surgeon, testified that after defendant was shot in the right hand, it would have been difficult for him to hold and operate a gun with that hand.

The defense suggested that someone else—either Renee Ross, Oscar Ross (Renee's brother, and also a paraplegic), or James Cornish—had killed the officers. It presented testimony from James Pinckney, assistant sales manager at the dealership where Cornish worked, to show that James Cornish had left work to return home the morning of the murders. He may have left before 8:30 a.m. Witnesses described Cornish as using and dealing in illegal drugs.

A defense investigator said Oscar Ross told him that after Renee Ross let defendant out at the Butler house, they went to the car dealership to find Cornish, but he was not there. (Pinckney said they came by about 10 a.m.) They then went to the house to find defendant's drugs and gun, but turned back because the road was blocked. Other witnesses said they saw a woman near the Cornish house pushing a man in a wheelchair. They described the woman as wearing jeans and a numbered jersey. Ross had earlier testified she had been wearing pajamas.

In rebuttal, Drs. Steven Nelson, Elvert Nelson, and Allen Wolf testified that defendant could have held and shot a gun immediately after his injury. Nurse Mary Duron described defendant's ability to use his hand as of the time of trial. She added that defendant had told her "he was sorry about getting his friends involved and he felt bad about what he did to the officers'

wives." A prosecution investigator said Pinckney told him Cornish left at 9:20.

The jury found defendant guilty of first degree murder of Officers Trust and Doty, with a firearm-use enhancement as to each murder. It found defendant guilty of possession of cocaine, a lesser included offense under the charge of possession for sale. Finally, it found him guilty of possession of a concealable firearm by an ex-felon. As noted earlier, the jury found six special circumstances: two of multiple murder, two of murder to avoid arrest, and two of murder of a police officer.

At the penalty phase the prosecution proved a number of prior criminal convictions, including a 1959 armed robbery in Phoenix, and eight armed robberies in Los Angeles in 1961. Defendant was imprisoned for the Los Angeles robberies, and released on parole in 1968. In 1976 he shot at Leslie Howard in a dispute over money Howard owed defendant. In that same year defendant was convicted of assault with a deadly weapon for an incident in which a police officer approached defendant, who was sitting in a parked car outside a 7-Eleven market, and asked for identification. Defendant drew a gun. He fled from the car, but later surrendered to the officer. Jim Rodriguez, defendant's neighbor, testified that defendant said he had tried to shoot the officer but the gun jammed.

The defense called defendant's relatives, who testified to the economic hardships of defendant's childhood. Other witnesses described defendant's life during the early 1970's after he had been paroled from his robbery convictions. Former employers and fellow workers said defendant worked regularly during that period. A former probation officer and a high school teacher testified that defendant helped high school boys in a weight-lifting program. Witnesses generally described defendant as an outgoing, friendly person much admired by the youths of the neighborhood. Defendant showed no hostility toward the police. On cross-examination, however, defendant's brother admitted that defendant had been involved in selling marijuana and receiving stolen property during this period, and said that defendant played a kind of "game" with the police, trying to see what he could get away with.

Other witnesses said that when defendant was hospitalized after he was wounded in the bank robbery, he still had a positive attitude and was not bitter toward the police. Mark Munoz, also hospitalized after an automobile accident, said defendant had helped him to turn his attitude around.

Prison personnel testified that defendant's prison attitude was "average," and that he did not present particular problems. Cross-examination brought out a number of minor disciplinary infractions.

Finally, psychologist Robert Banks testified on the basis of various psychological tests, in particular the "Clinical Assessment Questionnaire," that although Daniels has superficially sociopathic traits, they are caused by an underlying pattern of schizophrenia. In rebuttal, psychologist Rex Beaber questioned the validity of the "Clinical Assessment Questionnaire," and asserted that in his opinion defendant was a sociopath.

After two days of deliberation the jury returned verdicts imposing the death penalty for each of the two charged murders. The court denied the motion for modification of judgment, and sentenced defendant to death. The sentence is consecutive to the previous sentence for bank robbery, and concurrent to the sentences imposed for possession of cocaine and unlawful possession of a firearm.

I.

ISSUES RELATING TO APPOINTMENT AND REMOVAL OF COUNSEL

On May 17, 1982, defendant was arraigned for the murders, and the court appointed the Riverside County Public Defender to represent him. Defendant requested appointment of Andrew Roth, who had represented him on his appeal from the bank robbery conviction. Defendant said he did not trust the public defender's office, and that Roth was representing him in a federal district court petition for habeas corpus attacking the bank robbery conviction on the ground that he did not receive competent representation from the public defender. Defendant was particularly upset that the deputy public defender who represented him in the bank robbery case did not inform him that the deputy was negotiating for a position with the district attorney. The judge denied defendant's request, and the public defender represented defendant through the preliminary hearing.

On October 12, 1982, the judge granted the public defender's ex parte motion to appoint Roth as cocounsel for defendant. The district attorney then moved to rescind Roth's appointment. He said he intended to call Roth as a prosecution witness, and that Roth thus had a conflict of interest which precluded him from representing defendant.

Defendant argued that the evidence the prosecution sought to elicit from Roth was barred by the attorney-client privilege. Counsel suggested that if the evidence were held admissible the defense might be willing to stipulate to some matters, and that in any event Roth's testimony would not be prejudicial to his client. The judge, however, granted the motion to vacate Roth's appointment. He did not ask defendant whether he would waive Roth's conflict of interest, and defendant did not volunteer to do so.

On December 10, 1982, the public defender moved to reinstate Roth as cocounsel for defendant. Defendant testified, and submitted a declaration, to the effect that he had consulted with independent counsel, was aware of Roth's conflict of interest, and was willing to waive any conflict. The trial court denied the motion.

On February 23, 1983, the public defender declared an unspecified conflict, and was removed from the case. Over defendant's objection, the court appointed Carl Jordan as counsel. On April 1 it appointed Attorney Warren Small as cocounsel for defendant.

At the commencement of trial defendant moved to relieve Jordan and Small, and to appoint Roth as his attorney. The motion was denied. At the commencement of the penalty trial defendant moved to substitute Roth for Small; the motion was again denied. Finally, after the penalty verdict, the court denied defendant's motion to appoint Roth to argue the motion for new trial.

On appeal, defendant raises a number of contentions relating to the trial court's rulings. We review each of these contentions.

A. *The appointment of the public defender.*

■ Defendant argues that the trial court abused its discretion when, at the arraignment of May 17, 1982, it appointed the public defender to represent defendant on the murder charges. He asserts that the deputy public defender who represented him at the bank robbery prosecution had not afforded him competent representation, and, unknown to defendant, had been negotiating for a position with the district attorney. Defendant had filed a petition for habeas corpus with the federal district court alleging that his bank robbery conviction should be overturned because of incompetence and conflict of interest on the part of the deputy. (The petition was denied two days after the arraignment.) Defendant argues that his counsel in the present case may have wanted to attack the validity of the bank robbery conviction; however, this would have placed the deputy in a position where he had to attack the competence of a former colleague.[2] Also, the deputy

---

[2] Even if counsel had been successful in excluding the bank robbery conviction, the prosecution could still have proved the facts underlying that conviction, since those facts were relevant to the prosecution's theory that defendant killed the two police officers in revenge for his having been shot while fleeing from the robbery scene. The underlying facts could also have been introduced at the penalty trial to show prior violent criminal activity, an aggravating factor. Thus if the sole effect of the alleged conflict of interest was to inhibit defense

public defender appearing at arraignment told the court that defendant had experienced difficulty in past communications with the public defender's staff, and had refused to communicate with them about the present case.

A similar issue arose before the Illinois Supreme Court three years ago. (*People* v. *Banks* (1987) 121 Ill.2d 36 [520 N.E.2d 617].) In that case defendant objected to the appointment of an assistant public defender to represent him in postconviction proceedings, because the appointee would have to attack the competence of trial counsel, an assistant public defender from the same office. The court refused to "presume that public defenders would allow any office allegiances to interfere with their foremost obligation to their clients." (520 N.E.2d at p. 620.) Rejecting a rule of per se disqualification, the court mandated disqualification only if defendant suggested particular circumstances showing actual conflict of interest. (P. 621.)

We agree with the Illinois Supreme Court that a rule of automatic disqualification is unnecessary, and would hamper the ability of public defenders' offices to represent indigents in criminal cases. It would be particularly inappropriate in the present case, since the deputy public defender whose competence might have been under attack was no longer with that office. Since defendant has not shown any personal or professional relationship suggestive of a conflict of interest between the deputies actually representing him in this case and the departed deputy who had represented him in the bank robbery trial, we conclude that the trial court was not required to find a conflict of interest barring appointment of the public defender.

Defendant's distrust of the public defender, and consequent difficulty in communicating with the deputies, is a matter for the trial court to consider as part of its discretionary decision in appointing counsel. (See *Drumgo* v. *Superior Court* (1973) 8 Cal.3d 930, 934-935 [106 Cal.Rptr. 631, 506 P.2d 1007, 66 A.L.R.3d 984], in which we upheld the court's ruling appointing counsel even though Drumgo, like the defendant in the present case, insisted that he distrusted and would not cooperate with the attorney the court appointed.) We do not perceive that difficulties between defendant and the public defender had reached the level of "irreconcilable conflict" precluding the effective assistance of counsel, as in *People* v. *Stankewitz* (1982) 32 Cal.3d 80, 94 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476] and *Brown* v. *Craven* (9th Cir. 1970) 424 F.2d 1166, 1170.[3]

counsel from challenging the validity of the bank robbery conviction, it had no significant effect on the trial or outcome of the case.

We note also that the public defender was replaced by private counsel prior to trial, thus eliminating any conflict of interest while ample time remained for private counsel to move to exclude evidence of the prior bank robbery conviction.

[3] Defendant argues that the public defender's office incompetently failed to investigate and preserve the crime scene. Presented as an argument for reversal based on incompetency of

## B. *Initial refusal to appoint Roth.*

■ Defendant also claims the court abused its discretion when, at the arraignment hearing of May 17, 1982, it refused to appoint Andrew Roth as defendant's counsel. He relies on our decision in *Harris* v. *Superior Court* (1977) 19 Cal.3d 786 [140 Cal.Rptr. 318, 567 P.2d 750]. In that case the superior court judge, after receiving a declaration of conflict from the public defender, appointed Attorneys Ballachey and Mintz to represent defendants, despite the defendants' request for appointment of Attorneys Susan Jordan and Leonard Weinglass. Our opinion noted not only the subjective considerations—defendants' long relationship with counsel Jordan and Weinglass, and their confidence in those attorneys—but also objective considerations. Defendants had been members of an organization known as the Symbionese Liberation Army, and the charged crimes, as well as other alleged crimes, arose from the activities of that organization. Jordan and Weinglass had represented the defendants in related prosecutions arising from these activities and had an extensive background in the factual and legal issues likely to arise in the case in question. We therefore found the judge's refusal to appoint them an abuse of discretion.

In response, the Attorney General argues that *Harris* is relevant only in cases in which the public defender is unavailable, so the court must choose between private counsel. The Attorney General points out that in *Charlton* v. *Superior Court* (1979) 93 Cal.App.3d 858 [156 Cal.Rptr. 107], the Court of Appeal interpreted the court's authority to appoint private counsel when the public defender is unavailable (§ 987.2) as precluding appointment of private counsel when the public defender is available. Its decision expressly distinguished *Harris*, *supra*, 19 Cal.3d 786, limiting that precedent to a case in which the court cannot appoint a public defender. (93 Cal.App.3d at p. 863.)

Defendant argues that *Charlton* goes too far in limiting the trial court's discretion. Section 987.2 says the court may appoint private counsel when a public defender is unavailable; it does not say that this is the only circumstance under which appointment is permissible. If a case arose in which defendant was unable to cooperate with the public defender (see *People* v.

---

counsel, the contention fails because defendant has not shown prejudice; he has not alleged what exonerating evidence would probably have been discovered by a competent investigation. (See *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Defendant recasts the argument as a basis for "informed speculation" (*People* v. *Mroczko* (1983) 35 Cal.3d 86, 105 [197 Cal.Rptr. 52, 672 P.2d 835]) that the public defender's alleged conflict of interest prejudiced the defense. But there is no basis whatever for speculating that the possibility that the deputy public defender may have had to attack the competence of a former colleague had anything to do with the manner in which that deputy investigated, or refrained from investigating, the crime scene.

*Stankewitz* (1990) 51 Cal.3d 72, 85 [270 Cal.Rptr. 817, 793 P.2d 23]), or in which appointment of private counsel would save considerable time and expense, defendant maintains that the trial court should have discretion to appoint private counsel.

The present case does not require us to decide that question. Unlike *Harris* v. *Superior Court, supra*, 19 Cal.3d 786, in which Attorneys Jordan and Weinglass had represented defendants on similar cases arising from the same alleged conspiracy, and thus had extensive experience and knowledge relating to the charged crime, in the present case Roth had represented defendant only on the bank robbery appeal and on minor traffic matters, none of which had much relationship to the murder case at issue. And unlike *Stankewitz, supra*, 51 Cal.3d 72, there is no showing here that defendant suffered from a mental disorder that prevented him from assisting the public defender in a rational manner. Under these circumstances the trial court was not required to appoint Roth to represent defendant.[4]

### C. *Removal of Roth.*

### (1) *The ruling of November 12, 1982.*

Roth assisted the public defender on a pro bono basis until October 15, 1982, when on motion of the public defender he was appointed cocounsel. The motion was filed under seal and heard ex parte, without the prosecutor present. When he learned of the appointment, however, the prosecutor moved to revoke it, asserting that because he intended to call Roth as a witness, there existed a conflict of interest precluding Roth from serving as defendant's counsel.[5] The matter came up for hearing on November 8 and November 12, 1982.

At the hearing, the district attorney said he would ask Roth three questions: (1) Did Roth tell defendant his appeal had been lost? (2) Did he tell defendant to appear in court? (3) When defendant did not appear, did he

---

[4] As we have noted, although the court refused to appoint Roth at the time of arraignment, it did appoint him several months later. Defendant complains that during the intervening period, when he was only represented by the public defender, his counsel failed to investigate the case adequately. We discussed the contention in footnote 2, *ante.*

[5] The defense argues that the prosecutor's efforts to remove Roth constitute misconduct, citing cases which state generally that the prosecutor should not interfere with the defendant's relationship with his attorney. (E.g., *Barber* v. *Municipal Court* (1979) 24 Cal. 3d 742 [157 Cal.Rptr. 658, 598 P.2d 818] [police agent attending attorney-client conferences].) It suggests that the prosecution wanted to obtain Roth's removal because it feared he would be more effective than the public defender. There is, however, nothing in the record to suggest that the prosecutor did not act in good faith to avoid the risk that a conviction would be tainted by defense counsel's conflict of interest.

tell defendant a bench warrant had been issued? The district attorney explained that answers to these questions would help to prove that defendant was expecting the police to come and arrest him, and that his killing of the police officers was premeditated. The prosecutor presented testimony that Roth told Wayne Astin, a deputy district attorney, that Roth had notified defendant to appear. He pointed out that Roth's testimony would unquestionably constitute relevant and material evidence, tending to show that defendant had expected the police officers' arrival, and that his actions were not impulsive but premeditated.[6] The defense offered to stipulate to some of the matters sought by the prosecution, but the specifics of the stipulation were never set out. Roth assured the judge that his testimony would not prejudice defendant.[7] The judge, however, replied to Roth that "The court made the appointment based on less than complete knowledge, and the Court would not have made the appointment had the Court had complete knowledge, and under the circumstances, I feel it's inappropriate that you continue to represent him." The judge then granted the motion to revoke the appointment.

■ Defendant contends that the judge erred in removing Roth. He points out that while the trial court enjoys a broad discretion in deciding who to appoint to represent a defendant, its power to remove counsel, appointed or retained, is far more limited. ■ "[T]he involuntary removal of any attorney is a severe limitation on a defendant's right to counsel and may be justified, if at all, only in the most flagrant circumstances of attorney misconduct or incompetence when all other judicial controls have failed." (*Cannon* v. *Commission on Judicial Qualifications* (1975) 14 Cal.3d 678, 697 [122 Cal.Rptr. 778, 537 P.2d 898]; see *Maxwell* v. *Superior Court* (1982) 30 Cal.3d 606, 615 [180 Cal.Rptr. 177, 639 P.2d 248, 18 A.L.R.4th 333]; *Smith* v. *Superior Court* (1968) 68 Cal.2d 547, 561 [68 Cal.Rptr. 1, 440 P.2d 65].) ■ We believe, however, that the specific circumstances of this case call for an exception to the rule that a judge enjoys less discretion in removing counsel than in appointing counsel. Specifically, we note that (1) counsel was appointed in an ex parte proceeding, without notice to the

---

[6] The defense objected that the questions sought information privileged under the attorney-client privilege. The judge ruled that to the extent that the conversations simply communicated the time and date of scheduled court appearances, matters of public knowledge, they were not confidential. (See generally McCormick, Evidence (3d ed. 1984) § 91, pp. 217-221; 8 Wigmore, Evidence (McNaughton ed. 1961) § 2311, pp. 599-603.) He therefore overruled defendant's objection. Although on appeal defendant attacks the ruling removing Roth on a variety of grounds, he does not assert that the court erred in its decision that the conversations were not protected by the attorney-client privilege.

[7] At trial Roth testified over objection that he had told defendant that the appeal was lost. He also described at some length the chronology of the bank robbery trial, appeal, and related habeas corpus proceedings. That chronology, however, was a matter of public record, and could have been proved without Roth's testimony.

prosecutor; (2) the prosecutor promptly informed the court of his objection to the appointment; and (3) at the time of the appointment the court was unaware of the grounds on which the prosecutor objected.[8] Under these circumstances, the court should have the authority to reconsider its appointment free of the strict rules which limit its power to remove counsel.

When the court, for the first time, considered the matter in a proceeding in which the prosecutor was present and made known his objection, the court declared that it would not have appointed Roth had it known of the possibility of a conflict of interest. It then vacated that appointment. Its actions in this respect fall within its discretionary power.

(2) *The ruling of December 10, 1982.*

■ On December 10, 1982, the court heard defendant's motion to reinstate Roth. Defendant consulted with independent counsel, Patrick Mulloy, and submitted a declaration waiving any conflict of interest.[9] He offered to stipulate to any facts the prosecution sought to prove through Roth's testimony. Deputy Public Defender Keller testified that Roth had been assisting him on a pro bono basis throughout the case, and that absent such assistance he did not believe defendant would cooperate with him.

Judge Garst denied the motion. Ruling from the bench, he confirmed his position that had he known of the conflict, he would not have appointed Roth in the first place.[10] For the reasons previously stated, the court acted

---

[8] Defendant points out that when Judge Garst appointed Roth he was aware that Roth had represented defendant in appealing the bank robbery conviction. But that fact does not show that the judge was aware that Roth might be a witness. Although the defense charges that the prosecutor did not plan to call Roth as a witness until he learned that Roth had been appointed counsel, nothing in the record supports that charge.

[9] The waiver reads in part as follows:

"It is so important that I have Mr. Roth as my attorney that I will:

"1. Expressly give up any objection that I might have to Mr. Roth testifying for the prosecution, or

"2. Expressly stipulate to whatever facts the prosecutor wants to prove by Mr. Roth's testimony, or

"3. Expressly admit whatever facts the prosecutor wants to prove by Mr. Roth's testimony, or

"4. Expressly give up any objections that I might have to the prosecutor arguing to the jury about Mr. Roth's testimony, or

"5. Expressly waive my attorney-client privilege concerning conversations with Mr. Roth between April 20, 1982 through May 15, 1982, or

"6. Expressly agree to whatever fair and reasonable suggestion the Judge might have to allow Mr. Roth to continue as my lawyer."

[10] Judge Garst also asserted that if the public defender was available he could not be displaced by counsel of defendant's choosing. Roth, however, was originally appointed as cocounsel with the public defender, upon a showing that the needs of the defense required two counsel, and the public defender could not furnish the second counsel.

within its discretionary power. The court is not required to appoint counsel with a conflict of interest even if the client is willing to make a voluntary and informed waiver.

### D. *The hearing before the guilt phase.*

■ On September 6, prior to the opening statements at the guilt trial, defendant sent a letter to the judge in which he said he did not trust Attorneys Carl Jordan and Warren Small. He asked the judge to remove them and appoint Roth, and requested appointment of independent counsel to help him present the case for removal. Judge Schulte read the letter and invited comments from defendant and counsel. (See *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].)

Defendant now complains that Judge Schulte ruled without full knowledge, since he was not aware of everything that transpired during the various hearings before Judge Garst. The record before him, however, was sufficient to make it clear that defendant had no particulars to support his general distrust of Jordan and Small, and confirms Judge Schulte's conclusion that they were providing competent representation. We find no error in his refusal to recuse them.

Defendant also complains of the court's failure to appoint independent counsel to represent defendant on the *Marsden* motion. He cites *People v. Stewart* (1985) 171 Cal.App.3d 388 [217 Cal.Rptr. 306], which held that when a motion for new trial was based on incompetency of counsel, the court can appoint new, independent counsel to represent defendant in arguing that motion. Assuming *Stewart* authorizes appointment of independent counsel when a *Marsden* motion is based on alleged incompetency of present counsel, the trial court did not abuse its discretion in failing to appoint independent counsel because defendant offered no grounds, other than his distrust of all counsel except Roth, to suggest that present counsel were incompetent.

### E. *The hearing before the penalty phase.*

■ After the guilt trial, defendant and Attorney Small requested that Roth be appointed to serve at the penalty trial. (It is not clear whether Roth would be an additional attorney, replace Small, or replace Jordan.) The motion pointed out that the initial reason for not appointing Roth no longer existed, since Roth would not be a witness at the penalty trial. The judge denied the motion as dilatory, since it would have required a continuance of the penalty trial.

As in the previous motion, defendant expressed a general distrust of Jordan and Small—indeed of any attorney except Roth—but did not give any basis for his feelings. He hints that he could not disclose what really happened at the time of the killings to Jordan and Small, but did not explain why, nor in what respect the "true story" would have aided his defense. We see no error in the court's denial of the motion.

F. *Defendant's request for new counsel to argue the motion for new trial.*

■ Defendant requested appointment of Roth to argue the motion for new trial. As we have noted, *People* v. *Stewart, supra,* 171 Cal.App.3d 388, authorizes appointment of new counsel if the motion for new trial is based on incompetency of existing counsel. Defendant's charges of incompetency, however, are not sufficient to show that the trial judge abused his discretion in denying the request.

Defendant specified four charges: (a) that he did not explain fully to Jordan and Small what happened at the murder scene because he did not trust them; (b) that the court had denied some of their motions for investigative funds; (c) that they lacked experience, neither having tried a capital case before; and (d) that they did not obtain an expert ballistics report. The first ground does not demonstrate counsel's incompetence, only defendant's refusal to cooperate. The other grounds relate to matters which the court, having observed the trial and counsel's conduct of the defense, could reasonably conclude offered no hope of success.

## II.

### ISSUES RELATING TO PRETRIAL MOTIONS

A. *Motion to change venue.*

On April 28, defendant, through Attorneys Jordan and Small, requested funds to conduct a public opinion survey to determine whether defendant could get a fair trial in Riverside County. In an in camera hearing, counsel pointed out the extensive media publicity during the days following the crime. Newspaper articles described the killer as a Black man in a wheelchair, who killed two policemen attempting to serve an arrest warrant. The articles recounted defendant's past criminal offenses, including many which would not be admissible until the penalty trial, if at all. Other articles described the SWAT team searches of neighborhoods where Daniels might have been hiding. One article said police were deluged with calls giving tips for investigation and offering to contribute to a memorial fund. "People are

really, really upset about it," said one officer; another described the "tremendous community response." Newspapers printed numerous letters calling for the execution of the killer. Funeral services for the slain officers were attended by about 3,000 people.

Publicity diminished after defendant's arrest, but resumed as trial approached. In March of 1983, about three months before trial, the school board debated a proposal to rename its football stadium for Officer Doty. A friend of Officer Trust formed a nonprofit organization to aid families of slain police officers. On May 18, the anniversary of the killing and one month before trial, the county unveiled a nine-foot statue to police officers killed in the line of duty. Although the statue commemorates all such officers, the publicity attending its unveiling referred largely to Officers Trust and Doty. It is located outside the courthouse where this case was tried.

The court denied defendant's request for funds, saying that juror bias could best be determined at voir dire; the proof of the "pudding, so to speak, is in the eating." Defendant petitioned for mandate in the Court of Appeal, which denied his petition on June 10.

On May 31, defendant moved for change of venue, advancing essentially the same arguments as presented in camera at the April 28 hearing. The judge denied the motion, stating again that the voir dire would best determine whether defendant could receive a fair trial.

Defendant again moved for change of venue when the jury was selected. The record shows that approximately 64 prospective jurors were examined. Most expressed some familiarity with the case. Of the jurors selected, four had no recollection of the incident. The others recalled that police officers were shot; some recalled that the suspect was a Black paraplegic; two remembered Daniels' name. All said unequivocally that they could set aside any impressions formed outside the courtroom and consider the evidence without prejudice. The trial court concluded that defendant had failed to show the necessity for a change of venue, and denied the motion.

(1) *The motion for funds.*

Defendant planned to make a pretrial motion for change of venue, and requested funds to undertake a survey of community knowledge and attitudes about his trial. He contends that the trial court erred when it

denied his request on the ground that jury voir dire was the best way to determine community attitudes.[11]

The motion for funds to undertake a community survey is one addressed to the discretion of the trial court. (See *Lucero* v. *Superior Court* (1981) 122 Cal.App.3d 484, 489-490 [176 Cal Rptr. 62].) The court, however, must exercise its discretion on the basis of such considerations as the cost and feasibility of the survey, and whether the results of such a survey would be of significant value in deciding a pretrial motion to change venue. It cannot refuse to exercise discretion on the theory that voir dire of the jury is a better method of assessing the need to change venue, as that reasoning would deny a defendant his right under section 987.9 to funds reasonably necessary to present his pretrial venue motion.

We find, however, that defendant was not prejudiced by the court's ruling. As we explain later in this opinion (see, *post*, pp. 853-854), defendant did not exhaust his peremptory challenges or object to the jury as finally composed. We regard such inaction by defense counsel as a tacit acknowledgment that, regardless of community attitudes generally, the jury as finally selected was a fair and impartial body.

(2) *The motion to change venue before voir dire.*

In *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 383 [66 Cal.Rptr. 724, 438 P.2d 372], we held that " '[a] motion for change of venue . . . shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had.' " Upon appellate review of a ruling denying a change of venue, "the reviewing court must independently examine the record and determine de novo whether a fair trial is or was obtainable." (*People* v. *Harris* (1981) 28 Cal.3d 935, 948 [171 Cal.Rptr. 679, 623 P.2d 240].) The scope of review, however, differs depending upon whether the matter arises before or after trial. "A significant difference between pretrial and posttrial review is that after conviction in determining whether a defendant received a fair and impartial trial under the 'reasonable likelihood' standard, the review is *retrospective*. It extends to an examination of what actually occurred at the trial." (*People* v. *Martinez* (1978) 82 Cal.App.3d 1, 13 [147 Cal.Rptr. 208].) "In other words, voir dire may demonstrate that pretrial publicity had no prejudicial effect." (*People* v. *Harris, supra,* 28 Cal.3d 935, 949.) Drawing on *People* v. *Salas*

---

[11] We are hampered in our review because the superior court has apparently lost the moving papers filed by defendant. We have, however, the transcript of the hearing itself, and we perceive no disagreement between the parties concerning either the basis for defendant's motion or for the judge's ruling.

(1972) 7 Cal.3d 812, 818 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832], *Harris* went on to specify the factors to be considered in evaluating a motion to change venue: "the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim." (28 Cal.3d at p. 948.)

■ We examine the factors in the present case. (1) The offense, the murder of two police officers, is of course one of extreme seriousness and gravity, so this factor weighs in favor of a change of venue. (See *Harris, supra,* 28 Cal.3d at p. 948; *Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 941 [187 Cal.Rptr. 455, 654 P.2d 225].) (2) The media coverage was extensive; although it diminished during the period after defendant's arrest, extensive coverage resumed during the period immediately preceding the trial. It did not bring to the public attention illegally seized evidence, or inadmissible confessions, but did recount prior criminal activity which would not be admissible at the guilt phase of the trial. (3) The community, Riverside County, has a population of over 600,000. In *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1131 [240 Cal.Rptr. 585, 742 P.2d 1306], which also involved Riverside County, we characterized this as a neutral factor. (See also *Odle, supra,* 32 Cal.3d at pp. 938-939 [Contra Costa County, with very similar population].) (4) Defendant was a longtime resident of the county, but not a person of particular notoriety or status. (5) The victims were also local residents of no particular prominence, but became posthumous celebrities as a result of the media coverage of the murders. (See *Odle, supra,* 32 Cal.3d at pp. 940-941.)

With respect to defendant's motion before jury selection, the case so closely resembles *Odle* v. *Superior Court, supra,* 32 Cal.3d 932, that *Odle* could be considered controlling. Odle was charged with the murder of a young woman. When police attempted to arrest him, a gunfight resulted in which one policeman was killed. The nature and extent of the publicity, the size of the county, and the status of defendant and the victims are all quite comparable.

We concluded in *Odle, supra,* that the extensive publicity during the period following the crime was insufficient, either by itself or in combination with other factors, to establish a reasonable doubt that a fair trial could not be had. (32 Cal.3d at p. 943.) We added, however, that if voir dire revealed that the dissemination of potentially prejudicial material was more

widespread than was anticipated, the court would have the opportunity to change venue at that time. (*Ibid.*) We reach the same conclusion here.[12]

(3) *The motion to change venue after voir dire.*

■■■ As we have noted, the voir dire of the jury showed that most prospective jurors had heard or read of the crime. That fact, however, is not in itself sufficient to require a change of venue. **(15)** We explained in *People* v. *Harris, supra,* 28 Cal.3d 935, that " 'juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone [does not] presumptively deprive[] the defendant of due process.' " (P. 949, quoting *Murphy* v. *Florida* (1975) 421 U.S. 794, 799 [44 L.Ed.2d 589, 594, 95 S.Ct. 2031].) " 'It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " (28 Cal.3d at p. 750, quoting *Irvin* v. *Dowd* (1961) 366 U.S. 717, 723 [6 L.Ed.2d 751, 755-756, 81 S.Ct. 1639].)

On the other hand, the fact that the jurors declared they could decide the case impartially on the evidence does not preclude the necessity of a change of venue. In *People* v. *Williams* (1989) 48 Cal.3d 1112 [259 Cal.Rptr. 473, 774 P.2d 146], we said that proof that over half the prospective jurors, and eight of the twelve ultimately seated, had heard of the case demonstrated the "pervasiveness of the news coverage." (P. 1128.) Even though most jurors attested that they could render an impartial verdict, we concluded that the story of the crime had become so "deeply embedded in the public consciousness" that it was "more than a reasonable possibility that the case could not be viewed with the requisite impartiality." (P. 1129.)

■■■ We note points of similarity and difference with *Williams.* A greater percentage of prospective jurors had heard of the crime in this case than in *Williams;* with respect to those seated the proportion—eight of twelve—is identical. Thus it appears that the news coverage here was comparable in extent to that in *Williams.* On the other hand, the *Williams* case arose in a county of much smaller population. In *Williams* the jurors were not only familiar with the case, but two of them were personally acquainted with the district attorney. (*Williams, supra,* 48 Cal.3d at p. 1130.) Finally, in this case, unlike *Williams,* defendant did not exhaust his peremptory challenges, using only 15 of 26 challenges.

---

[12] Defendant relies on *Williams* v. *Superior Court* (1983) 34 Cal.3d 584 [194 Cal.Rptr. 492, 668 P.2d 799] and *Martinez* v. *Superior Court* (1981) 29 Cal.3d 574 [174 Cal.Rptr. 701, 629 P.2d 502]. The same grounds distinguish both cases. Each arose from a county of much less population than the present case. Both involved particularly prejudicial publicity concerning the trial of a codefendant, in which evidence was presented which showed defendant's guilt. And both arose on pretrial writ, before voir dire of the jury, so the reviewing court could not examine the voir dire to determine whether the jury as chosen appeared fair and impartial.

This last factor is decisive. In *People* v. *Balderas* (1985) 41 Cal.3d 144, 180 [222 Cal.Rptr. 184, 711 P.2d 480], we noted that defense counsel had used only 13 of 26 challenges, and concluded that this fact strongly indicated that the jurors were fair, and that the defense itself had so concluded. This reasoning draws support from language in *People* v. *Coleman* (1989) 48 Cal.3d 112, 136 [255 Cal.Rptr. 813, 768 P.2d 32], *People* v. *Welch* (1972) 8 Cal.3d 106, 114 [104 Cal.Rptr. 217, 501 P.2d 225], and *People* v. *Sommerhalder* (1973) 9 Cal.3d 290, 303 [107 Cal.Rptr. 289, 508 P.2d 289]. In the absence of some explanation for counsel's failure to utilize his remaining peremptory challenges, or any objection to the jury as finally composed, we conclude that counsel's inaction signifies his recognition that the jury as selected was fair and impartial.

B. *Motion to discover complaints against Officer Bulf.*

Officer Bulf was one of the officers who arrested defendant for bank robbery, and probably the one who shot and crippled defendant. Prior to trial the defense moved to review any complaint within the past five years against Bulf relating to the use of deadly force. (See Evid. Code, § 1045.) The trial judge reviewed the officer's file in camera, and told defendant that the only complaint within the last five years was irrelevant because it did not involve any violence or threat of violence. Defense counsel asked if the complaint reflected on the officer's veracity. The court understood the question as relating to incidents involving the use of deadly force, the subject of counsel's motion, and replied, "No sir. In the P-2 file, there is only one shooting incident within the last five years, and that is the shooting incident involving defendant." Defendant later discovered that the file included a complaint alleging that Officer Bulf filed a false and misleading police report in a case not involving the use of deadly force.

▄ Defendant contends that although he only asked for complaints relating to violence, counsel's question on veracity showed that he was also interested in complaints relating to credibility, and the judge's statement misled him. Had the judge said there was a complaint that the officer filed a false and misleading report, the defendant would have sought and obtained discovery.

Defendant fails, however, to show that he was prejudiced by the misunderstanding. He argues that proof of the shoot-out following the bank robbery was crucial to the prosecution's theory of the case. He does not, however, show that the complaint would have seriously undermined Officer Bulf's description of the facts, or that the prosecution could not have proved those facts through other witnesses. The details of the shoot-out, moreover, are not particularly important in this case; it seems undisputed

that police officers shot defendant as he attempted to flee the robbery scene. Even if, as defendant suggests, they had less justification for shooting him than would appear from Officer Bulf's testimony, it does not appear reasonably probable that the verdict would have been any different.

### C. *Failure to test Renee Ross for gunshot residue.*

Police investigators found Renee Ross about 12:30 p.m., about four hours after Officers Doty and Trust were killed. Sergeant Ropac considered testing her hands for gunshot residue, but decided not to because her emotional state convinced him that she was not the killer, it was four hours after the shooting, and Ross had driven a car and handled various objects during that period. Maintaining that the police had failed to preserve exculpating evidence, the defense moved to dismiss the charges or for alternative sanctions. The trial court denied the motion.

Under *California* v. *Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d 413, 104 S.Ct. 2528], the state's duty to preserve evidence is limited "to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality [citation], evidence must . . . possess an exculpatory value that was apparent before the evidence was destroyed . . . ." (Pp. 488-489.)

*Trombetta* and other cases cited by defendant address a situation in which the police have destroyed evidence in their possession. The present case, however, is more analogous to *People* v. *Hogan* (1982) 31 Cal.3d 815 [183 Cal.Rptr. 817, 647 P.2d 93], in which the police failed to obtain fingernail scrapings from the victim. *Hogan* noted that the police duty to obtain exculpatory evidence is not as strong as its duty to preserve evidence already obtained. (P. 851.) We know of no authority that would require the police to obtain and preserve evidence under circumstances comparable to the present case.

Defendant, however, fails even under the *Trombetta* standard. Assuming that a contemporaneous test of Ross's hands would have been reliable, there is nothing in the record to suggest the result would have been exculpatory. Defendant has never presented any evidence whatever suggesting that Renee Ross fired a gun. Thus defendant has not shown the existence of evidence of exculpatory value, or, for that matter, that any exculpatory value was apparent at the time to the officers who contacted Ross.

## III.

### GUILT PHASE ISSUES

A. *Admissibility of evidence of the circumstances of defendant's arrest for bank robbery.*

 The prosecution introduced evidence of defendant's flight following the 1980 bank robbery, the police pursuit, and the exchange of gunfire which left defendant crippled. The testimony was admitted to show motive—that defendant killed the police officers in revenge for his own injuries—and intent to kill. Defendant objected that the testimony violated Evidence Code section 1101 and, alternatively, that it should have been excluded under Evidence Code section 352.

 Evidence that a defendant committed crimes other than those for which he is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity. (*People* v. *Durham* (1969) 70 Cal.2d 171, 186 [74 Cal.Rptr. 262, 449 P.2d 198]; Evid. Code, § 1101, subd. (b).) The trial court judge has the discretion to admit such evidence after weighing the probative value against the prejudicial effect. (*People* v. *DeRango* (1981) 115 Cal.App.3d 583, 589 [171 Cal.Rptr. 429], citing *People* v. *Matson* (1974) 13 Cal.3d 35, 40 [117 Cal.Rptr. 664, 528 P.2d 752].) When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant. (*People* v. *Thompson* (1980) 27 Cal.3d 303, 315 [165 Cal.Rptr. 289, 611 P.2d 883].) Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." (*Id.* at p. 316.)

 Defendant initially argues that the relationship between the bank robbery incident and the charged murders is distant and tenuous, because the murders occurred over a year after the robbery and subsequent shooting, and not during the heat of the charged offense. Defendant relies on *People* v. *Bigelow* (1984) 37 Cal.3d 731, 747-749 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723], in which we held inadmissible evidence of prior robberies introduced on the theory that defendants were living on the proceeds of robbery. Our opinion, however, noted that the motive for robbery is generally to obtain the victim's property, and proof that defendant had committed prior robberies with the same motive was not probative of

any contested issue. (P. 748.) The period of time between the offenses was not a factor. (*Ibid.*)

As long as there is a direct relationship between the prior offense and an element of the charged offense, introduction of that evidence is proper. (*People* v. *Robillard* (1960) 55 Cal.2d 88, 100 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086] [past crimes admissible to show intent and motive]; *People* v. *Durham, supra*, 70 Cal.2d at pp. 186-189 [parole status and recent criminal activity relevant to show premeditated murder of police officer]; *People* v. *De La Plane* (1979) 88 Cal.App.3d 223, 245-246 [151 Cal.Rptr. 843] [evidence of prior robberies admissible to show motive to murder witnesses]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 756-758 [230 Cal.Rptr. 667, 726 P.2d 113], [evidence of prior interest in killing law officers admissible to show intent].) It is not necessary that the prior criminal act occurred within hours or days of the charged offense. (See *Rodriguez, supra*, 42 Cal.3d at pp. 756-758.)

In the instant case there is a direct relationship between the events surrounding the bank robbery, particularly the shooting of defendant, and issues in the charged offense. Despite the gap in time, there is a direct relationship between the police rendering defendant a paraplegic and defendant murdering the officers in retribution. This is particularly true when coupled with other admitted evidence of defendant's antipathy toward the police. (See *Rodriguez, supra*, 42 Cal.3d at pp. 756-758.) The trial court did not contravene *People* v. *Bigelow, supra*, 37 Cal.3d 731, by finding this evidence relevant and admissible.

Defendant argues further that the testimony of the bank robbery incident is irrelevant because intent was not "at issue" in the case. He claims that his defense contested only the issue of identity and that the robbery evidence is not probative on that point. Under *People* v. *Thompson, supra*, 27 Cal.3d 303, 315, no other elements of the crime were at issue, because *Thompson* held that "[t]he fact that an accused has pleaded not guilty is not sufficient to place the elements of crimes charged against him 'in issue.'"

In *People* v. *Rodriguez, supra*, 42 Cal.3d at pages 757-758, however, we substantially limited the scope of *Thompson, supra*, 27 Cal.3d 303. *Rodriguez* held that when the defendant did not isolate the issue of identity until after the prosecutor had completed his case-in-chief, the court did not err in permitting the prosecutor to present evidence of prior criminal conduct to prove premeditation, willfulness, and malice aforethought. Thus, contrary to *Thompson*, it appears that defendant's plea does put the elements of the

crime in issue[13] for the purpose of deciding the admissibility of evidence under Evidence Code section 1101,[14] unless the defendant has taken some action to narrow the prosecution's burden of proof.

In the instant case defendant offered no concession which limited the issues, so the prosecution had the burden of proving all the elements of the crime. Furthermore, the robbery evidence is relevant to the contested issue of identity, because it suggests that defendant had a motive to kill the officers which other suspects lacked. We conclude that the evidence of the 1980 robbery was admissible under Evidence Code section 1101.

Defendant further argues that the evidence should have been excluded under Evidence Code section 352 on the ground that its probative value does not outweigh its prejudicial potential. He contends in the alternative that the trial court should have read a sanitized version of the incident into the record, by reading, for example, from the police report.

We believe the evidence in question was highly probative on the issues of motive and intent—and, indeed, was crucial to the prosecution's theory of the case. We recognize the prejudicial effect of evidence that defendant had fired at a police officer when attempting to escape after the bank robbery, but note that before the testimony was received the court instructed the jury pursuant to CALJIC No. 2.50 that the evidence was admitted only for the limited purpose of proving motive or intent for the crimes charged, and not to show propensity to commit criminal acts. We note also that the trial court limited the testimony to what happened after the bank robbery, beginning with the chase, and allowed only one witness to testify about the incident. We conclude that defendant has failed to show that the trial court abused its discretion by admitting the testimony of the bank robbery incident.[15]

---

[13] It does not, however, put in issue the elements of any affirmative defense. (*People* v. *Schader* (1969) 71 Cal.2d 761, 775-776, fn. 13 [80 Cal.Rptr. 1, 457 P.2d 841].)

[14] Some evidentiary privileges can be waived if the holder of a privilege puts the content of a privileged communication "in issue." (See, e.g., Evid. Code, § 1016 (psychotherapist-patient privilege).) This opinion is limited to the effect of a not guilty plea on the admissibility of evidence under Evidence Code section 1101, and does not imply that such a plea waives any evidentiary privilege.

[15] Defendant also argues that it was error not to hold a foundational hearing pursuant to Evidence Code section 403 before admitting the evidence. (See *People* v. *Simon* (1986) 184 Cal.App.3d 125 [228 Cal.Rptr. 855].) But defendant's contention on this point, first raised in his reply brief, is unclear; while he contends that Officer Bulf's description of the events was "misleading," he does not state specifically what preliminary facts would need to be determined in an Evidence Code section 403 hearing before that testimony would be properly admitted. And defendant makes no attempt to demonstrate prejudice from the absence of such a hearing.

### B. *Admissibility of rebuttal testimony.*

Defendant presented expert evidence that the bullet wound to his right hand damaged the ulner nerve and would have made it impossible to shoot a gun. In rebuttal, the prosecution over defendant's objection presented testimony of doctors and a nurse who described the condition and use of the hand at various times up to the date of trial. Nurse Elaine Gordon further testified over defense objection that she and defendant had a conversation about his injuries, "and he ended up saying the only thing he felt bad for what he did to the police officers was their wives . . . . What he did to their wives." The implication of this testimony was that defendant had killed the officers.

■ We have no doubt that the testimony relating to the condition and use of defendant's hand was proper rebuttal. While the condition and use of his hand some time after the officers were killed is not conclusive proof of what he could do on that occasion, it is surely of some probative value, especially when, as here, expert medical testimony explained the relationship between present and past condition.

■ Elaine Gordon's testimony recounting defendant's admission, however, was not proper rebuttal. In *People* v. *Carter* (1957) 48 Cal.2d 737 [312 P.2d 665], the court explained that "[i]n a sense all evidence that tends to establish the defendant's guilt over his protestations of innocence rebuts the defendant's case, but it is not all rebuttal evidence within the purpose of section 1093, subdivision 4. [(Now § 1093, subd. (d).)] ■ The purpose of the restriction in that section is to assure an orderly presentation of evidence so that the trier of fact will not be confused; to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial; and to avoid any unfair surprise that may result when a party who thinks he has met his opponent's case is suddenly confronted at end of trial with an additional piece of crucial evidence. Thus proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt. [Citations.] A defendant's reiterated denial of guilt and the principal facts that purportedly establish it does not justify the prosecution's introduction of new evidence to establish that which defendant would clearly have denied from the start." (Pp. 753-754.)

In *Carter*, the defendant testified that he had not been present at the murder scene; the court nevertheless held that evidence showing that he had been present was improper rebuttal, since proof of his presence was an

essential part of the prosecution case-in-chief. (48 Cal.2d at p. 754.) The present case is an even stronger case for exclusion, since here defendant did not testify that he did not kill the officers, but only presented evidence, such as the injury to his hand, from which the jury might infer that he did not kill them. And the fact which the rebuttal evidence tended to prove—that defendant killed the officers—is obviously central to the criminal prosecution, and something which should be proved as part of the prosecution case-in-chief.

Although defendant's statement to Nurse Gordon amounted to an acknowledgment of guilt, we do not find its erroneous admission as rebuttal testimony to be reversible error. The prosecution's case-in-chief included evidence that defendant had made similar admissions to Renee Ross, Delores Butler (in the presence of Clara Butler), Claire Schall, and Ted Smith. In light of this evidence we do not think it reasonably probable that absent the testimony of Elaine Gordon the jury would have reached a verdict more favorable to defendant.

C. *Exclusion of proposed testimony of James Heiting.*

Defendant called James Heiting, his former attorney, who offered to testify that on defendant's behalf he had filed a civil action against the City of Riverside and the Riverside Police Department for injuries caused when defendant was shot during the January 1980 bank robbery. Heiting, however, withdrew from the civil action because he felt "harassed" by the city and the police department. The harassment consisted of three incidents: (1) The city attorney told Heiting that he should reconsider his decision to pursue the suit because the city was going to win and then the police department would "teach you [Heiting] or let you know that you should not take cases of this nature." (2) The city attorney warned Heiting that he considered the litigation as having been brought in "bad faith and without probable cause" and threatened a malicious prosecution suit. (3) The police arrested defendant's investigator for suspicion of indecent exposure and cited him for possession of marijuana.

The prosecution objected to Heiting's proposed testimony based on Evidence Code section 352. The court ruled that Heiting could testify only that he brought an action for damages against the city based upon the shooting incident, but he could not explain the circumstances of his withdrawal from the litigation.

Defendant argues that this alleged harassment was relevant to the instant prosecution of defendant because it demonstrated that the police department, and thus the police witnesses, were biased and prejudiced

against defendant. But defendant makes no showing that the officers who testified approved of or were even aware of the actions mentioned by Heiting. Moreover, the proffered evidence would have taken the case into issues unrelated to defendant's guilt. Whether the city attorney's threats suggest institutional bias against defendant, for example, depends largely on whether the city attorney believed defendant's damage suit was filed in bad faith and without probable cause. Whether the arrest of defendant's investigator suggests police bias depends largely on whether the police had reasonable grounds to believe the investigator guilty of the crimes for which he was arrested. The trial of such issues could have consumed considerable time, and could have diverted the jury's attention from the issues of the case at hand. We conclude that the court's ruling limiting Heiting's testimony was proper.

### D. *Exclusion of testimony of John Pinckney.*

Defendant called John Pinkney, James Cornish's employer, to support defendant's theory that Cornish had been dealing in cocaine. The prosecution objected, and the court held a hearing pursuant to Evidence Code section 402. At the hearing, Pinkney stated that he had seen Cornish give packages to people at work, but Pinkney did not know the contents of the packages, nor had he seen a package given in return for money. Pinkney had been told that Cornish was borrowing money. Pinkney had spoken to Cornish about Cornish's drug use but he was not sure if he had in fact witnessed drug deals involving Cornish. The court concluded that Pinkney's proposed testimony was based on rumor, hearsay and speculation, and found that Pinkney did not have personal knowledge of cocaine sales. It therefore excluded this testimony.

Defendant argues that the trial court erred because enough evidence had been presented to allow a trier of fact to conclude that Pinkney had actually witnessed drug transactions. But even though Pinkney's proposed testimony is *consistent* with the defense theory that Cornish conducted drug transactions at his place of employment, Pinkney's testimony would have offered no facts to support that theory.[16]

---

[16]The following exchange between the district attorney and Pinkney is particularly illustrative:

Question: "All right. Do you have any personal knowledge that Mr. Cornish was dealing cocaine?"

Answer: "Only speculation."

Question: "And what was that speculation based on?"

Answer: "Based upon rumors from other individuals probably involved."

Question: "Other individuals probably involved?"

Answer: "Uh-huh."

Question: "Did you ever see Mr. Cornish engaged in what you thought was a drug transaction?"

Defendant maintains that, when viewed in the context of the trial as a whole, the evidence was more than sufficient to establish Pinkney's personal knowledge of drug transactions involving Cornish. Defendant states that there was evidence that Cornish had furnished cocaine to a babysitter, that Cornish had access to cocaine found at the scene of the shooting and that Cornish had been involved in other drug transactions. Defendant therefore insists that if Pinkney's testimony had been admitted a reasonable jury could have found that Cornish was dealing cocaine at his workplace.

This argument lacks merit. Whether Cornish was in fact involved with cocaine at other times, or indeed sold cocaine at work, has no bearing on whether Pinkney *had personal knowledge* that Cornish sold drugs at work. Even if Cornish did in fact deal drugs at work, Pinkney did not necessarily have personal knowledge of such activity. Defendant essentially contends that personal knowledge can be inferred through hindsight. But "proof of personal knowledge must be shown *first*, once a party has made an objection that the proffered witness lacks personal knowledge of the facts to which he proposes to testify." (Jefferson, Cal. Evidence Benchbook (1st ed. 1972) § 26.3, pp. 354-355.) The trial court did not err by excluding Pinkney's testimony for lack of personal knowledge.

E. *Admissibility of testimony of Ross and Smith.*

■■■ Defendant alleges that Renee Ross and Ted Smith were both told by police that they might be prosecuted as accessories if they refused to cooperate with the investigation. He contended that their statements to the police were coerced by the threat of prosecution, and moved to strike the trial testimony based on those statements. The trial court denied the motions.

We have frequently approved arrangements under which a witness who played a lesser part in the crime testifies for the prosecution in return for a plea to a less severe crime, or even total immunity. (See, e.g., *People* v. *Fields* (1983) 35 Cal.3d 329, 360-361 [197 Cal.Rptr. 803, 673 P.2d 680].) We have insisted that the arrangement require the witness to tell the truth, not to present a previously agreed-upon story (see *People* v. *Medina* (1974) 41 Cal.App.3d 438, 455-456[116 Cal.Rptr. 133]) and, of course, that the witness's consent must be voluntary (see *People* v. *Underwood* (1964) 61 Cal.2d 113, 124-125 [37 Cal.Rptr. 313, 389 P.2d 937]).

---

Answer: "I may have seen—I didn't—I'll put it this way: I may have seen instances where there were possibilities or say physically looked like things like that was going on, but as far as me actually knowing, no."

Witnesses Ross and Smith were asked to "cooperate" with the police, not to make a statement incriminating defendant whether true or not. Both had apparently helped defendant escape and hide from the police, and could in fact have been charged as accessories. (Compare *People* v. *Underwood*, *supra*, 61 Cal.2d 113, where a minor was threatened with the death penalty.) There is nothing improper in confronting a suspect with the predicament he or she is in, or with an offer to refrain from prosecuting the suspect if the witness will cooperate with the police investigation. More is needed to show that testimony is the inadmissible product of coercion, but nothing more has been presented on the record here. We conclude that the trial court properly denied the motions to strike.

### F. *Removal of a juror.*

The court ordered a hearing after it received a report that Juror Lloyd Francis, in violation of the court's instructions, had discussed the case with outsiders and had expressed an opinion on the issue of guilt prior to deliberations. At the hearing, Paul Lemley, who managed the apartment where Francis lived, testified that Francis "couldn't see how a man that was in a wheelchair could shoot another man and get out of the wheelchair and get another gun to shoot the other officer" and that Francis "can't see how that nigger was able to kill two policemen." Lemley also alleged that Francis had read a newspaper article concerning the case in the course of the trial. Wendell Johnson testified that he had been present when Francis made his remarks; Darlene Lemley said she had once overheard Francis discussing the case. Francis himself denied having expressed any opinions about the case, but the court found Paul Lemley's testimony to be true. It concluded that Francis's comments evidenced "serious misconduct that is willful, to the extent that both sides cannot receive a fair trial in the case." The court then removed Francis from the jury and substituted an alternate juror. Defendant asserts that the court's ruling was in error and, noting Francis's apparent sympathy with the defense, argues that he was prejudiced by the error.

The Attorney General argues that Francis's comments manifest a fixed opinion of defendant's innocence (see *People* v. *Brown* (1976) 61 Cal.App.3d 476, 480-481 [132 Cal.Rptr. 217]; *Deward* v. *Clough* (1966) 245 Cal.App.2d 439, 443-444 [54 Cal.Rptr. 68]) and justify his removal on the ground that he could not perform his duty to render a fair and impartial verdict. The defense replies that Francis stated only tentative views, responsive to the evidence he had heard, and those views were insufficient to prove him biased against the prosecution. (See *Kimic* v. *San Jose-Los Gatos etc. Ry. Co.* (1909) 156 Cal. 379, 399-400 [104 P. 986].) We do not find it necessary to resolve that matter, because we conclude that a court may exercise its

discretion to remove a juror for serious and wilful misconduct, such as that shown by Juror Francis's repeated violation of the court's instructions, even if this misconduct is "neutral" as between the parties and does not suggest bias toward either side.

Penal Code section 1089 and Code of Civil Procedure section 233 (former Pen. Code, § 1123) specify that a juror may be substituted at any time before the jury returns a verdict if upon "good cause shown to the court [the juror] is found to be unable to perform his duty."[17] Neither section 1089 nor Code of Civil Procedure section 233 define "good cause." It is clear to us, however, that a juror's serious and wilful misconduct is good cause to believe that the juror will not be able to perform his or her duty. Misconduct raises a presumption of prejudice (*People v. Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050]; *People v. Conkling* (1896) 111 Cal. 616, 628 [44 P. 314]), which unless rebutted will nullify the verdict. The likelihood of the People rebutting that presumption is, of course, far less when the offending juror remains on the jury and participates in the verdict than when the juror is promptly removed. Consequently, "[s]ubstitution of an alternate juror upon a showing of good cause is desirable to maintain judicial efficiency. By means of substitution retrial of lengthy cases may be avoided." (*People v. Collins* (1976) 17 Cal.3d 687, 692 [131 Cal.Rptr. 782, 552 P.2d 742].)

We recently decided *People v. Holloway* (1990) 50 Cal.3d 1098 [269 Cal.Rptr. 530, 790 P.2d 1327], in which it was discovered after the guilt verdict that a juror, contrary to the court's instructions, read a newspaper article about the case. We found this to be misconduct raising a presumption of prejudice and, when the People were unable to rebut the presumption, we reversed the conviction. In *Holloway*, we observed that if the court had discovered the misconduct earlier, it could have removed the juror and avoided the necessity for retrial of the case. (50 Cal.3d at pp. 1111-1112.)

We note, however, that in *People v. Hamilton* (1963) 60 Cal.2d 105 [32 Cal.Rptr. 4, 383 P.2d 412], we said in dictum that a trial court could remedy juror misconduct only by declaring a mistrial, not by replacing the offending juror. In that case a juror became interested in the law during the trial and, during the noon recesses, went to the library and read the entire

---

[17] Penal Code section 1089 provides in pertinent part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty . . . the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box . . . ."

Code of Civil Procedure section 233 provides in pertinent part: "If, before the jury has returned its verdict to the court, a juror becomes sick or, upon other good cause shown to the court, is found to be unable to perform his or her duty, the court may order the juror to be discharged."

Penal Code. The trial court found that this constituted misconduct and discharged the juror, substituting an alternate in her place. We held that the trial court erred in dismissing the juror in question because "the mere reading of the Penal Code, for sole purpose of becoming better informed, cannot, without more, be either misconduct or an act which results in inability to perform the duties of a juror." (P. 126.)

*Hamilton*, however, went on to state that: "Section 1089 does not provide that misconduct of a juror shall be a ground for substituting an alternate. If the judge believed the juror had been guilty of misconduct, then he should have granted the motion for mistrial . . . . If he did not so believe, there was no room for a finding that [the juror] was unable to perform her duties." (60 Cal.2d at p. 127.) This language implies that even if Juror Francis committed misconduct the court had no authority to replace him with an alternate juror.

*Hamilton* based the quoted statement on the legislative history of section 1089, from which it concluded that the Legislature was unwilling "to either adopt a practice of unrestricted substitution of jurors or to authorize a wide discretion in the trial court beyond that required to apply the facts shown to any of the four causes for substitution which are set forth in the statute." (60 Cal.2d at p. 126.) The four causes are death, illness, request for discharge, or inability to perform the juror's duty; the *Hamilton* court apparently did not believe the alleged misconduct in that case, the juror's reading of the Penal Code, rendered her unable to perform her duty. In contrast, we believe the misconduct in the present case did indicate that Juror Francis was unable to perform his duty. That duty includes the obligation to follow the instructions of the court, and a judge may reasonably conclude that a juror who has violated instructions to refrain from discussing the case or reading newspaper accounts of the trial cannot be counted on to follow instructions in the future.

Cases subsequent to *Hamilton* (*supra*, 60 Cal.2d 105) have refused to follow its dicta. In *People* v. *Guzman* (1977) 66 Cal.App.3d 549 [136 Cal.Rptr. 163], the offending juror proposed bartering an acquittal of one defendant for guilt of a codefendant. When the trial judge learned of this proposal he discharged the offending juror and replaced him with an alternate. The Court of Appeal in *Guzman* rejected the defendant's claim that a mistrial is the only remedy for juror misconduct. Expressly rejecting the *Hamilton* dicta, the court said that "[a]n iron-clad rule barring the replacement of a wayward juror with an available alternate could have a monstrous effect on judicial efficiency." (P. 558.) After giving as an example a case in which a juror discussed the case with outsiders, the Court of Appeal said: "We find it impossible to believe that under such circumstances the trial

court has no choice but to grant a mistrial, although alternates are available and the offending juror's well-encapsulated misconduct could not have had any effect on his fellow jurors. [¶] We therefore hold that a juror's misconduct is 'good cause' which, under the provisions of section 1089—as well as section 1123—may permit the court to replace him with an alternate." (P. 559.)

In *People* v. *Diaz* (1984) 152 Cal.App.3d 926 [200 Cal.Rptr. 77], the defendant was charged with assault with a deadly weapon. During the course of the trial, the trial court learned that a juror concealed during voir dire that she had been feloniously assaulted during an attempted rape. The trial court denied defense counsel's motion to dismiss the juror. The Court of Appeal reversed. Citing *People* v. *Guzman, supra,* 66 Cal.App.3d 549, it concluded that "[a] juror's misconduct is good cause which, under the provisions of either section 1089 or 1123, may permit the court to replace him or her with an alternate . . . ." (152 Cal.App.3d at p. 934.)

We conclude, in accord with this analysis, that the trial court has the discretion under section 1089 to remove a juror for serious and wilful misconduct, and that the court acted within its discretion in removing Juror Francis in this case. Language to the contrary in *People* v. *Hamilton, supra,* 60 Cal.2d 105, is disapproved.

G. *Instructions relating to testimony of Renee Ross.*

Renee Ross was originally charged as an accessory for aiding in defendant's escape after the murders. She testified under a grant of immunity. Defendant did not specifically request an instruction on immunized-witness testimony but rather requested instructions that accessory testimony is to be viewed with caution. Defendant contends that as an accessory, the court should have permitted the jury to find Ross an accomplice and should have instructed that testimony by an accomplice must be corroborated and viewed with caution. Defendant also contends he was entitled to an instruction relating to Ross's status as one criminally involved in the offense and testifying under immunity.

 Section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."[18] To be an accom-

---

[18] Section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

plice, the witness must have "'guilty knowledge and intent with regard to the commission of the crime.'" (*People* v. *Gordon* (1973) 10 Cal.3d 460, 466-467 [110 Cal.Rptr. 906, 516 P.2d 298], quoting *People* v. *Duncan* (1960) 53 Cal.2d 803, 816 [3 Cal.Rptr. 351, 350 P.2d 103].) Defendant is correct that when the knowledge and intent of the witness is disputed, the witness's status as an accomplice is a question for the jury. (*Gordon, supra,* 10 Cal.3d at p. 468.) However, if the facts are not in dispute, "the question is legal and to be determined by the trial judge." (*People* v. *Hoover* (1974) 12 Cal.3d 875, 880 [117 Cal.Rptr. 672, 528 P.2d 760].)

■ In the present case, there are no disputed facts regarding Ross's guilty knowledge and intent and the trial judge accordingly refused to present the issue to the jury. Defendant presents no facts illustrating Ross's intent which raise her status to accomplice. The evidence shows Ross was nothing more than a bystander who got caught up in the cross fire and then aided defendant in his escape. At most, Ross was an accessory after the fact. However, we have held mere accessories are not accomplices under section 1111. (*People* v. *Tewksbury* (1976) 15 Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 1335]; see also *People* v. *Balderas, supra,* 41 Cal.3d 144, 193-194, holding that accessory after the fact is not an accomplice.) As a mere accessory, defendant was not entitled to a cautionary instruction on Ross's testimony, and the trial judge correctly refused to so instruct.

Defendant points to federal authority which, he contends, defines "accomplice" more broadly than we have. The Ninth Circuit held an accomplice is "one who could have been indicted for the same offense either as an accessory or principal." (*People of Territory of Guam* v. *Dela Rosa* (9th Cir. 1980) 644 F.2d 1257, 1260-1261.) Defendant's reliance on *Dela Rosa* is wholly misplaced. Besides answering a question completely different than that in the present case,[19] *Dela Rosa* quite simply does not bind us. California decisions have explicitly held that to bring an accessory within the section 1111's definition of accomplice, it must be demonstrated that the accessory acted with the same "guilty knowledge and intent with regard to the commission of the crime." (*People* v. *Duncan, supra,* 53 Cal.2d at p. 816.) The federal authority cited by defendant does not compel us to a different conclusion.[20]

---

"An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

[19] The question in *Dela Rosa* was whether the witness was granted immunity at all and, if so, was the court's failure to give the requested instruction error.

[20] Defendant points to no authority requiring the court to instruct the jury that immunized-witness testimony is to be viewed with distrust. We have held that the court has no such duty to instruct sua sponte. (*People* v. *Leach* (1985) 41 Cal.3d 92, 106 [221 Cal.Rptr. 826, 710 P.2d 893].)

H. *Instructions on voluntary manslaughter.*

Defense counsel requested an instruction on voluntary manslaughter arising from provocation and heat of passion. The court refused to so instruct.

 The court may refuse to instruct on a lesser included offense, despite the defendant's request, when there is no evidence to support that instruction. (*People* v. *Turville* (1959) 51 Cal.2d 620, 632-633 [335 P.2d 678]; cf. *People* v. *Wickersham* (1982) 32 Cal.3d 307, 323-325 [185 Cal.Rptr. 436, 650 P.2d 311], explaining duty to instruct sua sponte on lesser included offenses.) In the present case there is no evidence of provocation by the slain officers, and no evidence that defendant was in the "heat of passion" when he killed them. The theory that defendant was bent on revenge for having been crippled by police gunfire after the bank robbery is insufficient to justify a manslaughter instruction. For such an instruction, the killing must be "upon a sudden quarrel or heat of passion" (§ 192); that is, "suddenly as a response to the provocation, and not belatedly as revenge or punishment. Hence, the rule is that, if sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter." (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against the Person, § 517, pp. 584-585.) The period of over two years and three months between defendant's injury and the killing of the police is, as a matter of law, sufficient to allow passions to cool. (See *People* v. *Pickens* (1969) 269 Cal.App.2d 844, 852 [75 Cal.Rptr. 352]; *People* v. *Ashland* (1912) 20 Cal.App. 168, 177 [128 P. 798].)

 Defendant contends, however, that the foregoing reason is based on the rule that malice may be inferred from proof of an intentional homicide, and that the defendant has the burden of going forward with evidence of provocation and heat of passion. He maintains that this rule, although well established in noncapital cases (*People* v. *Wickersham, supra,* 32 Cal.3d 307, 324; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 719 [112 Cal.Rptr. 1, 518 P.2d 913]), should not be applied in capital cases. Instead, he contends, in a capital case the prosecution should have the burden of proving absence of provocation and heat of passion, and even absent any defense evidence on those matters the jury must still evaluate the sufficiency of the prosecution's proof.

Defendant relies on the fact that former section 1105, which codified the inference of malice,[21] stated expressly in subdivision (b) that "[n]othing in

---

[21] Former section 1105 stated: "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends

this section shall apply to or affect any proceeding under Section 190.3 or 190.4.”[22] Sections 190.3 and 190.4 describe respectively the method of determining the penalty in a capital case and the procedure for trial of special circumstances and penalty. The reference to those sections in subdivision (b) of former section 1105 served to dispel any danger that subdivision (a) of that former section might have been construed to enact an inference in favor of a verdict of death or a finding of special circumstances, and to place on the defendant the burden of overcoming that inference. There is no reason to believe the Legislature intended to make it more difficult to prove guilt in a murder case involving special circumstances than in a murder case without such circumstances.

### I. *Instructions on premeditation.*

██ The court refused to give an instruction, based on *People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942], which would have told the jurors that “[t]he type of evidence which the courts have found proper to sustain a finding of premeditation and deliberation falls into three basic categories”: (1) evidence of planning activity, (2) evidence of motive, and (3) inferences based on the nature of the killing. “A finding of premeditation and deliberation may occur where there is evidence of all . . . types . . . and otherwise requires at least strong evidence of type one or evidence of [type] two in conjunction with either type one or three.”[23]

The court’s ruling was correct. As we explained in *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1020-1021 [245 Cal.Rptr. 185, 750 P.2d 1342], the

---

to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.”

[22] Section 1105 was reenacted in 1989 as section 189.5, without significant change.

[23] Defendant’s proposed instruction B read in full:

“The types of evidence which the courts have found proper to sustain a finding of premeditation and deliberation fall into three basic categories:

“(1) Facts which may be characterized as ‘planning’ activity;

“(2) Facts about the defendant’s prior relationship and/or conduct with the victim from which the jury could reasonably infer a ‘motive’ to kill the victim. This inference of motive, if it exists, together with pre-planning activity and the peculiar manner of the killing would in turn support an inference that the killing was a result of ‘a pre-existing reflection’ and ‘carefully thought and weighing of considerations’ rather than ‘mere unconsidered or rash impulse hastily executed . . .’;

“(3) Facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a ‘preconceived design’ to take his victim’s life in a particular way for a ‘reason’ which the jury can reasonably infer from facts mentioned above.

“A finding of premeditation and deliberation may occur where there is evidence of all three aforementioned types of evidence and otherwise requires at least strong evidence of type one or evidence of two in conjunction with either type one or three.”

*Anderson* analysis (*supra*, 70 Cal.2d 15) is intended as a framework to aid in appellate review when a defendant claims that a finding of premeditation and deliberation is not supported by substantial evidence. It was not intended to form the basis for a jury instruction; to the contrary, as *Lucero* affirms (44 Cal.3d at p. 1021.), the standard jury instruction (CALJIC No. 8.20) given to define premeditation and deliberation is sufficient.

■ Defendant also requested an instruction telling the jury that in deciding the issue of premeditation and deliberation, the jury may consider eight listed factors, including knowledge of the issuance of a warrant, motive, flight, and physical inability.[24] Defendant based his instruction on *People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847], which held that on request a defendant is entitled to an instruction "relating particular facts to any legal issue."

In *People* v. *Wright* (1988) 45 Cal.3d 1126, 1137 [248 Cal.Rptr. 600, 755 P.2d 1049], however, we explained that "the language quoted by defendant refers only to a defendant's right to an instruction that 'pinpoint[s] the theory of the defense.' [Citing *People* v. *Granados* (1957) 49 Cal.2d 490, 496 [319 P.2d 346].] In a proper instruction, '[w]hat is pinpointed is not specific evidence as such, but the *theory* of the defendant's case.' (*People* v. *Adrian* (1982) 135 Cal.App.3d 335, 338 [185 Cal.Rptr. 506], original italics.)"

Tested by this standard, defendant's requested instruction C is faulty. Its references to the "presence or absence of knowledge that a warrant . . . could be served on May 13, 1982," or to the "presence or absence of evasive conduct by defendant shortly prior to May 13, 1982"—to take two examples—do not pinpoint a theory of the defense, but instead ask the jury to consider the impact of specific evidence. Although neutrally phrased, such

---

[24] Defendant's proposed instruction C said that:
"Defendant is charged in Count _____ with having committed the murder of _____ in the first degree, that is, that it was a wilful, deliberate and premeditated killing. In determining whether in regard to premeditation and deliberation reasonable doubt exists, as that term has been previously defined you may consider all [of] the evidence of the following:
"(1) The presence or absence of knowledge that the appeal had been denied;
"(2) The presence or absence of knowledge that a warrant had been issued;
"(3) The presence or absence of knowledge that, a warrant having been issued, [it] could be served on May 13, 1982;
"(4) The presence or absence of motive;
"(5) The presence or absence of evasive conduct by defendant shortly prior to May 13, 1982;
"(6) The ability or inability of the defendant to accomplish the acts attributed to him;
"(7) The conclusiveness or inconclusiveness of the physical evidence;
"(8) The nature of the testimonial evidence presented against the defendant and the motives under which such evidence was given."

an instruction may nevertheless be rejected as argumentative under *People v. Wright, supra,* 45 Cal.3d 1126.

Defendant points to *People* v. *Wright, supra,* 45 Cal.3d 1126, where we approved the giving of an instruction which listed the "factors" the jury should consider in evaluating eyewitness identification testimony. (P. 1143.) He contends that the "factors" listed in the instruction we there approved do not pinpoint a theory of defense, but instead relate to evidentiary considerations similar to those in his proposed instruction C.

*Wright*'s approval of detailed jury instructions on factors bearing upon eyewitness identification, however, does not signal our approval of equally detailed instructions on every issue to come before a criminal jury. It rested on our analysis in *People* v. *McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011], where we concluded, based on expert testimony and the professional literature, that some of the relevant factors bearing upon eyewitness identification may be imperfectly known to jurors, and contrary to the intuitive beliefs of many. (P. 368.) We are aware of no similar concerns with regard to whatever factors might bear upon the issues of premeditation and deliberation, and believe such matters can be addressed in argument without aid of a specific instruction such as the one defendant proposed. We conclude that the court did not err in refusing the instruction.

### J. *Instructions on eyewitness testimony.*

The trial court also rejected a proposed defense instruction relating to eyewitness testimony. Our decisions have suggested such an instruction when "identification is a crucial issue and there is no substantial corroborative evidence." (*People* v. *Wright, supra,* 45 Cal.3d 1126, 1144; see *People* v. *McDonald, supra,* 37 Cal.3d 351, 377.) The eyewitness's ability to identify defendant, however, is not in issue in the present case. Ross, the only eyewitness, was defendant's nurse, and undoubtedly could distinguish defendant from other persons. The defense questioned Ross's opportunity to observe the crime and, in particular, her credibility, but these are matters to be argued under the instructions given; we see no need for a special instruction on the subject.

### K. *Beeman error.*

The trial court instructed the jury under former CALJIC No. 3.01 that a person "aids and abets the commission of a crime if, in the knowledge of the unlawful purpose of the perpetrator of crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime." In

*People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318], we held this instruction was erroneous; to be an aider or abettor, a defendant must act with the *intent* to commit, encourage, or facilitate commission of the crime. (*Id.* at p. 560.)

We have held, however, that *Beeman* error is not prejudicial when the defendant was tried as the perpetrator, and there is no evidence from which the jury could infer that the defendant was an accomplice acting with knowledge of the perpetrator's purpose but without intent to aid in the commission of the crime. (See *People* v. *Bean* (1988) 46 Cal.3d 919, 949-950 [251 Cal.Rptr. 467, 760 P.2d 996]; *People* v. *Leach, supra,* 41 Cal.3d 92 at p. 105.) Such is the case here. The prosecution claimed defendant was the sole perpetrator; the defense, while suggesting other persons may have been involved, offered no evidence that defendant was an accomplice, or that he acted without intent to further the crime committed by the supposed perpetrator.

In addition, the jury returned specific findings that defendant personally killed Officer Trust and Officer Doty. These findings demonstrate that defendant was not convicted as an aider and abettor. (See *People* v. *Leach, supra,* 41 Cal.3d 92, 105-106.)

L. *Validity of the special findings.*

 As we noted in the previous section, the jury returned special findings. One finding stated: "We, the jury . . . find beyond a reasonable doubt that the defendant, Jackson Chambers Daniels, Jr., personally killed Dennis Doty with express malice aforethought and premeditation and deliberation." The other finding identically described the murder of Phil Trust. Defendant contends these findings constitute a "special verdict" in violation of section 1150.[25]

In *People* v. *Burgener* (1986) 41 Cal.3d 505 [224 Cal.Rptr. 112, 714 P.2d 1251], the jury determined that the murder was "committed with express malice aforethought and with deliberation and premeditation." (P. 537.) We held this determination constituted a "finding," not a "special verdict," and did not violate section 1150. Defendant advances no plausible basis for distinguishing *Burgener*, which is controlling on this point.

M. *Instructions and argument on duty to present evidence.*

 The court instructed the jury under CALJIC No. 2.11, which states: "Neither side is required to call as witnesses all persons who may

---

[25] Section 1150 provides: "The jury must render a general verdict, except that in a superior court, when they are in doubt as to the legal effect of the facts proved, they may . . . find a special verdict." The special verdict to which section 1150 refers is a verdict finding the facts only, leaving the judge to draw conclusions of law. (See § 1152.)

have been present at any of the events disclosed by the evidence or who may appear to have some knowledge of these events, or to produce all objects or documents mentioned or suggested by the evidence." The defendant argues that this instruction is misleading. His argument is not entirely clear, but it seems to be that the instruction puts both parties on the same basis, and does not make it clear to the jury that the prosecution has the burden to present sufficient evidence to prove the crime beyond a reasonable doubt.

The court rejected a similar contention in *People* v. *Orozco* (1981) 114 Cal.App.3d 435 [170 Cal.Rptr. 604]. In that case defendant asked that CALJIC No. 2.11 be modified to add language stating: "This rule does not, however, diminish the burden of the prosecution to prove their case beyond a reasonable doubt." (114 Cal.App.3d at p. 448.) The court replied that the instructions defining the presumption of innocence, reasonable doubt, and burden of proof were sufficient. We agree; the inference defendant fears the jury would draw from the language of CALJIC No. 2.11 is quite strained, and should be dispelled by proper instructions on proof beyond a reasonable doubt.

■ Defendant further complains that the prosecutor, acknowledging that he had failed to prove the origin of bloodstains in the hallway and on the carpet, said that "the defense can't say that's not defendant's blood." It would have "been nice to have it [the carpet] analyzed early on, but, you see, it's not just the fault of the prosecution, because the defense had access to this material too." Defendant first argues that the assertion that "the defense can't say that's not defendant's blood" is an improper reference to defendant's failure to testify. In context, however, it seems to be a comment on the failure of the defense to present scientific evidence analyzing the blood.

Defendant argues with more force that the prosecutor's statement was unfair, because by the time defendant was arrested and counsel was appointed, it might have been too late for the defense to conduct an analysis of the stains on the wall and carpet. That contention, however, is barred by defendant's failure to object to the prosecutor's statement when it was made. (See *People* v. *Green* (1980) 27 Cal.3d 1, 34-35 [164 Cal.Rptr. 1, 609 P.2d 468].) Moreover, even if defendant had objected, and succeeded in having the comment stricken, it is not reasonably probable that the outcome of the trial would have been affected.

N. *The court's remark concerning a continuance.*

■ Defendant requested postponement of closing arguments because of his illness. The judge granted the continuance, and explained to the jury

that "Mr. Daniels is ill today and . . . *his illness seems legitimate.* So we are going to recess until Monday morning." (Italics added.) Defendant says the court's language implied that he had feigned illness on other occasions. We think this is to read more into the words than the court intended, or the jury would have understood.

O. *Ineffective representation by trial counsel.*

Defendant alleges that his trial counsel was ineffective in two particulars: (1) for failing to move to set aside the prior bank robbery conviction on the ground that, Patrick Magers, his counsel in that case, was burdened by a conflict of interest and was constitutionally inadequate, and (2) for failing to move to recuse the district attorney's office on the ground that Magers's service in that office created an appearance of impropriety. We discussed both issues earlier (see, *ante,* pp. 842-843) in connection with the court's initial appointment of the public defender to represent defendant. We there concluded (1) that counsel's failure to move to set aside the prior bank robbery conviction did not affect the outcome of the case, and (2) Magers's conduct did not disqualify the district attorney's office from prosecuting defendant. These conclusions compel us to reject defendant's present contentions.

P. *Validity of the special circumstance of killing of a peace officer.*

Section 190.2, subdivision (a)(7), establishes as a special circumstance, making a defendant eligible for the death penalty, that the victim was a peace officer intentionally killed during the performance of his or her duties, and "the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of his or her duties."

 Defendant contends that the "reasonably should have known" language is unconstitutionally vague. We expressly rejected this argument in both *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 779-782, and *People* v. *Brown* (1988) 46 Cal.3d 432, 444-445 [250 Cal.Rptr. 604, 758 P.2d 1135]. Defendant offers no persuasive reason to overrule those decisions.

Concerned about the possible unconstitutionality of the statutory language (the trial preceded *Rodriguez* and *Brown*), the trial court modified that language and instructed the jury that the special circumstance applied only if the defendant "knew *and* reasonably should have known" the victim was a peace officer. Defendant argues that the court had no authority to do so, but he cannot base a claim of reversible error upon an instruction more favorable to him than the law requires.

## IV.

### PENALTY PHASE ISSUES

A. *Dismissal of jurors for cause.*

During the death-qualifying voir dire, prospective juror Michael Carr gave inconsistent answers. At one point the judge put the following question: "You are going to take an oath that you will follow the law, and if following the law leads to death, then you agree to vote for death. If following the law leads to life in prison, then you are to vote for life in prison. Do you think you could do that?" Carr replied, "Yes." The judge also asked, however, whether "regardless of the evidence . . . you would automatically and absolutely refuse to vote for the death penalty?" Carr again answered, "Yes." Upon further examination Carr said he would not vote for the death penalty in a case such as that of Adolph Hitler, Charles Manson, the Hillside Strangler, the Freeway Killer, or Sirhan Sirhan, and that he could not imagine any circumstances whatsoever in which he could vote for death.

Prospective juror James Henson affirmed that he would automatically vote against the death penalty regardless of the evidence. In response to questions by defense counsel, Henson said he might have "some leeway" and that he was "99.9 percent certain" that he would never vote for death.

■■■ Defendant contends that the exclusion of these jurors was improper under *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] and *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844]. It has long been settled, however, that " '[w]here a prospective juror gives conflicting answers to questions relevant to his impartiality, the trial court's determination as to his state of mind is binding upon an appellate court.' " (*People* v. *Floyd* (1970) 1 Cal.3d 694, 725 [83 Cal.Rptr. 608, 464 P.2d 64], quoting *People* v. *Linden* (1959) 52 Cal.2d 1, 22 [338 P.2d 397].) The court's determination that prospective jurors Carr and Henson would not properly consider both potential penalties was fairly supported by the record. (See *People* v. *Howard* (1988) 44 Cal.3d 375, 418 [243 Cal.Rptr. 842, 749 P.2d 279].)

B. *Denial of defendant's request to voir dire the penalty jury.*

Under section 190.4, subdivision (c), the same jury tries both guilt and penalty unless the court, for good cause, dismisses the jury after the guilt trial and selects a new penalty jury. Seeking to establish "good cause," defendant asked leave to voir dire the jurors before the start of the penalty trial. The court denied the motion.

 Defendant contends that the court had discretion to permit voir dire before the penalty trial, but totally fails to show an abuse of discretion. Surely the fact that the jury found defendant guilty after a brief deliberation does not compel the court to permit counsel to question the jurors. Neither does the fact that defendant claims he intends to present a penalty defense inconsistent with his defense at the guilt trial.

Defendant points to evidence, first discovered after the penalty trial, that a television producer had contacted Juror Donald Olive. But at the hearing on defendant's motion for new trial it appeared that the contact, if it occurred at all, occurred after the penalty trial. Nothing was put before the trial judge which would require him to permit counsel to voir dire the jury before the penalty trial. (See *People* v. *Malone* (1988) 47 Cal.3d 1, 27, 28 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1199 [240 Cal.Rptr. 666, 743 P.2d 301].)

### C. *Overlapping multiple-murder special circumstances.*

 Defendant was convicted of two multiple-murder special circumstances. Since one such finding would suffice to establish that defendant "has in this proceeding been convicted of more than one offense of murder . . ." (§ 190.2, subd. (a)(3)), the second finding was erroneous. (See *People* v. *Harris* (1984) 36 Cal.3d 36, 67 [201 Cal.Rptr. 782, 679 P.2d 433].)

We explained in *People* v. *Rodriguez, supra,* 42 Cal.3d 730, that in a case such as this such superfluous findings are generally not prejudicial. In the language of *Rodriguez,* "[t]he jury knew the actual number of murders of which appellant had been convicted, and it was permitted to consider the fact of multiple murder as an aggravating circumstance. We can find possible prejudice only if we think it is reasonably probable the jurors thought the *two murders* more heinous because two *multiple-murder* special circumstances had been charged. Nothing at trial, or in the arguments or instructions, was calculated to create that impression. We find no grounds for reversal." (P. 788.)

### D. *Denial of admissibility and funding of "Day in the Life" videotape.*

Early in the proceedings defendant requested funds under section 987.9 to film a videotape showing the defendant's daily activities and routine if he were confined as a life prisoner without possibility of parole.[26] He renewed

---

[26] During trial, defendant was confined at Chino state prison under his conviction for bank robbery. The Department of Corrections indicated that if defendant were sentenced to life imprisonment under the murder charge, he would probably be transferred to Vacaville,

the request before the penalty trial. Judge Mortland, assigned to rule on defendant's motion, said he would grant the funds if the trial judge would admit the videotape into evidence. After hearing argument from both prosecution and defense, however, the trial judge said he would not admit the tape.

■ Defendant first objects that section 987.9 contemplates that motions for funds will be heard in confidence, without the prosecutor present, and decided by a judge other than the trial judge. Questions of the admissibility of evidence, on the other hand, are generally decided by the trial judge with both sides present. Since there is no point in spending money to obtain inadmissible evidence, we see nothing wrong in Judge Mortland making his decision contingent upon the trial judge's ruling on admissibility. We also find no prejudice, for even if Judge Mortland had unconditionally authorized the expenditure, that would do defendant no good unless he could introduce the videotape into evidence.

Defendant further argues that the trial judge erred in ruling the tape inadmissible. In *People* v. *Easley* (1983) 34 Cal.3d 858, we said the jury should consider any " 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' " (P. 878, fn. 10, quoting *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954].) Later cases confirm that a defendant is entitled to introduce evidence of any aspect of his character or record he offers as a basis for mitigation. (*Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 6-7, 106 S.Ct. 1669]; *People* v. *Lucero, supra*, 44 Cal.3d 1006, 1029-1030.)

We agree with the trial court, however, that the projected videotape of defendant's future prison routine would not depict an aspect of his character or record, and would not be admissible in evidence. In *People* v. *Harris, supra*, 28 Cal.3d 935, we held inadmissible evidence of how the death penalty would be carried out, on the ground that such evidence had no bearing upon the " 'character and record of the individual offender and the circumstances of the particular offense.' " (P. 962, quoting *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978].) In *People* v. *Thompson* (1988) 45 Cal.3d 86 [165 Cal.Rptr. 289, 611 P.2d 883], we upheld a trial court ruling barring evidence both of how an execution would be carried out and of future conditions of confinement for one sentenced to life without possibility of parole. Such evidence, we said, was not relevant to the crime or defendant's culpability. While defendant might have an interest in telling the jurors of the horrors of execution or the

which has better facilities for handicapped inmates. The proposed videotape would have depicted the routine at Vacaville.

rigors of confinement in order to impress upon them the gravity of their responsibility, that interest could be satisfied in his argument. (P. 139.)

Defendant seeks to draw a distinction; he was not offering evidence to show generally the conditions under which a life prisoner is confined, but instead the conditions under which he, a paraplegic, would be confined. The cited decisions, however, do not rest on any distinction between evidence showing how persons generally are executed or confined and evidence showing how a particular defendant will be executed or confined; they rest upon the fact that the evidence of the manner of execution or confinement does not relate to the character or record of the defendant.

E. *Exclusion of the testimony of the prison chaplain.*

 Byron Eshelman, former chaplain at San Quentin Prison, proposed to explain the psychological impact of an impending execution on prisoners, and to testify that execution in the gas chamber was not instantaneous, but took considerable time, and was mentally and physically painful. The trial court refused to admit the testimony. Recognizing that such evidence is barred by *People v. Harris, supra,* 28 Cal.3d 935, 962, defendant asks us to overrule *Harris.*

Defendant argues that *Harris* overlooked the language in section 190.3 which states that "evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, *and sentence* . . . ." (Italics added.) From this language he infers that he should be allowed to present evidence explaining the nature of the sentencing choices even if that evidence is not relevant to any aggravating or mitigating factor.

If we looked only to the quoted phrase, defendant's argument might be plausible. In construing section 190.3 as a whole, however, we have reached the conclusion that under this statute the jury determines sentence by a process of weighing the aggravating and mitigating factors to determine whether the aggravating are so substantial in comparison with the mitigating as to justify a death sentence. (See *People v. Brown* (1985) 40 Cal.3d 512, 541-544 & 545, fn. 19 [220 Cal.Rptr. 637, 709 P.2d 440].) Thus evidence irrelevant to aggravation or mitigation is necessarily also irrelevant to sentence. We conclude that the trial court properly excluded the evidence in question.[27]

---

[27] It would be fundamentally illogical to hold that defendant can introduce evidence relating to sentence which the jury could not consider in imposing sentence. But to hold that the jury can base its sentence on something other than the statutory aggravating and mitigating factors would contradict both the language of the statute and virtually every decision of this court construing section 190.3.

### F. *Testimony of Lawrence Howard.*

██ The prosecution called Lawrence Howard to testify at the penalty trial. He said that in March 1976 defendant confronted him and Dornell Williams to demand money they owed him. Defendant hit Howard with a gun, knocking him to the ground, and then fired a shot into the asphalt near Howard's head. Defendant then kicked Williams and fired a shot over his head. The defense unsuccessfully objected to this testimony on several grounds, and renews these objections here.

First, defendant argues that he was never prosecuted for any crime arising from this incident, and that the statute of limitations on such crimes has run. But it has long been settled that evidence of prior violent crimes may be presented at the penalty trial even if the period of limitations has run on such crimes, because that evidence is introduced not to impose a penalty for the prior acts but to show matters in aggravation or mitigation. (*People* v. *Terry* (1969) 70 Cal.2d 410, 422 [77 Cal.Rptr. 460, 454 P.2d 36]; accord, *People* v. *Jennings* (1988) 46 Cal.3d 963, 981 [251 Cal.Rptr. 278, 760 P.2d 475].)

Second, defendant claims he did not receive notice of Howard's testimony "prior to trial," as required by section 190.3. Section 190.3 declares in pertinent part that "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, *prior to trial*." (Italics added.) "The purpose of the statutory notice is to advise an accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense at the penalty trial." (*People* v. *Miranda* (1987) 44 Cal.3d 57, 96 [241 Cal.Rptr. 594, 744 P.2d 1127].) The crucial phase "prior to trial" is nowhere expressly defined. But considering the purpose of the statutory provision, we believe it should be construed to mean "before the cause is called for trial." In order to have a reasonable opportunity to prepare a defense at the penalty trial, the defendant should be given notice of the aggravating evidence a reasonable time before the cause is called. Unless notice is given at such time, the defense may be denied the opportunity to undertake the investigation necessary to meet the evidence before it must turn to the time-consuming task of jury selection. It may also be deprived of the ability to conduct voir dire with adequate knowledge of the facts that will be presented on the issue of penalty as well as the issue of guilt. Finally, the defense may be prevented from trying the guilt phase—as it must—in the shadow of a possible penalty phase.

Here the prosecutor's original written notice, served before trial, did not mention Howard, but during jury selection the defense was notified that Howard had agreed to cooperate with the prosecution and would be called.

Although the defense thus learned that Howard might be called after trial commenced, it appears that the prosecutor notified the defense as soon as he was aware the evidence was available, and no prejudice arose. (See *People v. Jennings, supra,* 46 Cal.3d 963, 987-988.)[28]

Third, defendant claims that the trial court should have made a preliminary inquiry whether Howard's testimony was sufficient to prove each necessary element of a violent crime before permitting the jury to hear that testimony. *People v. Phillips* (1985) 41 Cal.3d 29, 72, footnote 25 [222 Cal.Rptr. 127, 711 P.2d 423], authorizes but does not require such an inquiry. Whether or not such an inquiry was appropriate here, defendant offers no reason to believe that it would have resulted in the exclusion of Howard's testimony, and thus fails to demonstrate prejudice.

Fourth, defendant complains that the trial judge failed to weigh the probative value of the evidence against its prejudicial effect, as provided in Evidence Code section 352. The prejudicial effect of prior-crime evidence in a guilt trial is the danger that the jury, even if instructed to the contrary, will reason that defendant has a propensity to commit crimes and improperly infer that he committed the charged crime. But whether defendant committed the charged crime is not at issue in the penalty phase. Defendant's character, including his propensity to commit crimes of violence, is in issue, and to the extent the evidence bears on this point it is probative, not prejudicial. Defendant has not identified any prejudicial effect of the evidence as that term is used in Evidence Code section 352. (See *People v. Karis* (1988) 46 Cal.3d 612, 641 & fn. 21 [250 Cal.Rptr. 659, 758 P.2d 1189]; *People v. Balderas, supra,* 41 Cal.3d 144, 204-205.)

G. *Evidence of prior convictions.*

As recounted in our summary of facts, the prosecution introduced evidence of numerous prior convictions. All of these crimes were crimes of violence, admissible under both section 190.3, factor (c) (prior felony convictions) and factor (b) (prior violent criminal conduct). With respect to such crimes, the prosecution is not limited to introducing documentary proof of the conviction, but may present evidence of the underlying conduct. (See *People v. Karis, supra,* 46 Cal.3d 612, 638-641; *People v. Keenan* (1988) 46 Cal.3d 478, 526 [250 Cal.Rptr. 550, 758 P.2d 1081]; *People v. Melton* (1988) 44 Cal.3d 713, 754 [244 Cal.Rptr. 867, 750 P.2d 741].)

---

[28] In *Jennings* and other cases (e.g., *People v. Howard, supra,* 44 Cal.3d 375, 425) we have inquired into whether the defendant requested or needed a continuance to prepare to meet the newly noticed evidence. In the present case, however, the notice was given during the jury voir dire, months before the penalty trial. Defendant clearly had adequate time to prepare to contest that evidence.

Defendant is particularly concerned that the prosecutor, referring to a plea-bargained conviction for a 1976 assault with a deadly weapon on two police officers, argued that defendant in fact attempted to kill the officers but his gun jammed. Contrary to defendant's contention, his conviction for assault with a deadly weapon did not constitute an *acquittal* for attempted murder, and does not bar the prosecutor from arguing that defendant in fact had attempted to murder the officers. (*People* v. *Melton*, *supra*, 44 Cal.3d 754-755.) But since it does not constitute a *conviction* of attempted murder, if the prosecutor planned to argue as an aggravating consideration under factor (b), that defendant was in fact guilty of attempted murder, he should have requested an instruction telling the jury that it could consider such crime only if proved beyond a reasonable doubt. (See *People* v. *Robertson* (1982) 33 Cal.3d 21, 55 [188 Cal.Rptr. 77, 655 P.2d 279].) The same analysis applies to prosecution evidence that when defendant assaulted the officers he was on his way to committing a robbery, and to evidence that during the commission of a 1962 store robbery defendant fired at the owner.

The court gave a reasonable-doubt instruction which applied to certain specified crimes; however, the attempted robbery in 1976, the attempted murder of the two officers who apprehended defendant on that occasion, and the 1962 assault were not among those specified. The court then instructed the jury that it should not consider in aggravation evidence of prior crimes other than those listed. This instruction properly limited the use of the prosecution evidence to proof of the circumstances of the crimes listed in the instruction or for which defendant was convicted, and barred use of that evidence to show additional crimes as aggravating circumstances. (*People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1185, 1197 [270 Cal.Rptr. 286, 791 P.2d 965].)[29]

## H. *The testimony of Dr. Beaber.*

The defense called a psychologist, Dr. Robert Banks, who testified that defendant was schizophrenic. On cross-examination the prosecutor referred to the Diagnostic and Statistical Manual of Mental Disorders (3d ed. 1980) (DSM III) diagnostic standards, and asked if defendant should not be classified as a sociopath. Dr. Banks replied, "No," that in his opinion, the defendant's sociopathic actions derived from an underlying schizophrenia.

The prosecutor then called another psychologist, Dr. Rex Beaber, as a rebuttal witness. Dr. Beaber explained the defining characteristics of a

---

[29] Defendant claims that, contrary to the court's instructions, the prosecutor's argument treated unlisted crimes as separate aggravating considerations. We discuss this contention in part IV.K, *post.*

sociopath, which included a likelihood to engage in criminal behavior. He then stated that in his opinion defendant was a sociopath, and that sociopaths do not change. The prosecutor relied on this testimony to argue that defendant might commit crimes in prison. ■ ■ ■ ■ Defendant contends that this stratagem was an attempt to evade our holding in *People v. Murtishaw* (1981) 29 Cal.3d 733, 773, 744 [175 Cal.Rptr. 738, 631 P.2d 446], which barred expert testimony predicting future violent acts.[30]

■ Dr. Beaber, however, did not testify that defendant would or probably would commit violent acts in the future. Neither did he claim that sociopaths necessarily commit violent crimes. To the contrary, he testified that sociopaths could conform to legal requirements when controls and surveillance are high, an answer which suggests that they could conform in a prison setting. When asked, "Would a sociopath always by the mere fact that he is a sociopath engage in criminal behavior?," he replied, "Oh, no. I think some of the finest trial attorneys, car salesmen, business executives and politicians are among the most sociopathic members of our culture."

Thus the expert evidence here was far more limited and qualified than in *Murtishaw*. In *Murtishaw*, moreover, the parties called our attention to numerous studies which demonstrated that predictions that a specific person would commit a future violent criminal act were highly unreliable—indeed, that experts so frequently overpredicted future violence that such a prediction was more likely to be wrong than right. (29 Cal.3d at p. 768.) The parties here have advanced no comparable data to show that a diagnosis of sociopathy, or Dr. Beaber's description of sociopathic behavior, is so unreliable that it cannot be utilized to rebut defense testimony supporting a different diagnosis. ■ ■ ■ ■ We conclude that the trial court did not err in admitting the evidence of defendant's sociopathy.[31]

### I. *Cross-examination of defendant's character witnesses.*

In cross-examining defendant's character witnesses, the prosecutor brought out evidence of defendant's commission of numerous nonviolent crimes, many of which were committed when defendant was a juvenile. The incidents included receiving stolen property, malicious mischief, truancy,

---

[30] *Murtishaw* was concerned solely with the admissibility of evidence. Its holding is not offended by prosecutorial argument on future dangerousness. (*People v. Davenport* (1985) 41 Cal.3d 247, 288 [221 Cal.Rptr. 794, 710 P.2d 861].)

[31] In his motion for new trial, defendant submitted declarations of four experts criticizing Dr. Beaber's testimony, especially his rejecting of the "Clinical Assessment Questionnaire" as a valid diagnostic tool. Defendant now argues that he was denied competent assistance of counsel by reason of counsel's failure to call any of these experts as rebuttal witnesses. The record, however, does not indicate counsel's reason for not calling these witnesses. Thus the issue of counsel's competency cannot be decided on appeal. (See *People v. Pope, supra,* 23 Cal.3d 412, 426.)

and various traffic infractions. Other evidence touched upon defendant's tardiness at work, lying, and sexual promiscuity. In some cases the witnesses themselves knew of the behavior; in others they had merely heard reports. Under *People* v. *Boyd* (1985) 38 Cal.3d 762, 772-776 [215 Cal.Rptr. 1, 700 P.2d 782], all this evidence, because it does not fall under any of the statutory aggravating factors, would be inadmissible in the prosecution's penalty case-in-chief.

■ Such evidence is, however, admissible to impeach testimony of defendant's good character. As we said in *People* v. *Rodriguez, supra*, 42 Cal.3d 730, 791, "[o]nce appellant placed his general character in issue, the prosecutor was entitled to rebut with evidence or argument suggesting a more balanced picture of his personality." Such rebuttal evidence need not meet the requirements for admissibility established in *People* v. *Boyd, supra*, 38 Cal.3d 762. (See *Rodriguez, supra*, 42 Cal.3d at p. 792.)

The prosecutor made very skillful use of this testimony in argument. After a defense psychologist had testified that defendant had an underlying schizophrenia, the prosecutor presented rebuttal testimony by a psychologist who said defendant was a sociopath. Then, at argument, the prosecutor noted that some of the acts brought out on cross-examination, such as juvenile vandalism, truancy, and habitual tardiness at work, are not only evidence of "bad character" but also diagnostic factors for sociopathy. Reviewing the diagnostic categories of DSM III, the prosecutor demonstrated that defendant's behavior corresponded to the diagnostic factors.

■ Defendant argues that this argument improperly used evidence admissible only to impeach as if it were admissible as substantive proof, and argues that the court should have instructed the jury on the limited use of impeaching evidence. He points to CALJIC No. 2.42, which directs the jury that "[w]here on cross-examination, a witness is asked if he has heard of reports of certain conduct of a defendant inconsistent with the traits of good character as to which the witness has testified, such questions and the witness' answers thereto may be considered only for the purpose of determining the weight to be given to the opinion of the witness or to his testimony as to the good reputation of the defendant. "Such questions and answers are not evidence that the reports are true and you must not assume from them that the defendant did in fact conduct himself inconsistently with such traits of character." Defendant did not request this instruction, but here contends that it should have been given sua sponte.

Defendant cites two decisions which have held that CALJIC No. 2.42 should be given sua sponte (*People* v. *Grimes* (1957) 148 Cal.App.2d 747,

750-751 [307 P.2d 932]; *People* v. *Bentley* (1955) 131 Cal.App.2d 687, 691-692 [281 P.2d 1]). But defendant and the Attorney General both fail to note that *Grimes* and *Bentley* were overruled in *People* v. *White* (1958) 50 Cal.2d 428 [325 P.2d 985]. In that case the rebuttal testimony offered was admissible only to impeach, but the jury was not so instructed. We held that "[i]n the absence of such a request, there [is] no duty upon the trial court to instruct the jury that the rebuttal testimony was admissible solely for the purpose of impeaching" the witness. (P. 430.) The same reasoning applies to impeaching testimony elicited on cross-examination. We conclude that the court did not err in failing to give the instruction sua sponte,[32] and, in the absence of such an instruction and of any objection from the defense, the prosecutor did not commit misconduct in arguing that the evidence could be used to show the truth of the matters stated. Defendant also argues that his sentence should be overturned because it was based in part on "unreliable evidence," i.e., hearsay and rumor which were introduced through the cross-examination of defense witnesses. But by presenting a psychological expert defendant necessarily opened the door to cross-examination inquiring into the factual basis of the expert's opinion; likewise by presenting character evidence defendant opened the door to cross-examination inquiring into the factual basis of the witness's judgment of his character. If defendant presents such evidence he must expect that it will be tested by cross-examination. Thus defendant cannot prevent the evidence in question from being heard by the jury; his only remedy to reduce the risk that the penalty sentence is based in part on that evidence is to request a limiting instruction.[33]

### J. *Issues relating to penalty phase jury instructions.*

1. At the guilt phase the court gave the standard instructions on evaluating evidence, including instructions on credibility of witnesses (CALJIC No. 2.20), expert testimony (CALJIC No. 2.80), and the like. At the penalty trial the court did not repeat the instructions or tell the jury whether any prior instructions still applied. ■■■■ Defendant contends that the court has a duty to instruct sua sponte on the basic principles for evaluation of evidence, and that its failure to do so is reversible error.

---

[32] This conclusion makes it unnecessary to consider the Attorney General's argument that at a penalty trial, evidence that a witness has heard of reports of the defendant's bad character can be used not only to impeach the witness but as substantive evidence in aggravation.

[33] Because defendant contends that the court had a sua sponte duty to instruct under CALJIC No. 2.42, he does not argue that counsel was incompetent for failing to request such an instruction. In any case, it is doubtful that counsel's failure to request an instruction would be prejudicial under the reasonable-probability test of *Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698, 104 S.Ct. 2052]. The evidence in question was properly before the jury, and even under CALJIC No. 2.42 it could be used to impeach defendant's mitigating evidence.

The court has a duty to instruct sua sponte on the general principles of law relevant to the evidence. (See 5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2924, pp. 3584-3586 and cases there cited.) This includes the duty to instruct on those general principles relating to the evaluation of evidence. (See *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 883-884 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845] [credibility of witnesses]; *People* v. *Yrigouyen* (1955) 45 Cal.2d 46, 49 [286 P.2d 1] [circumstantial evidence]; *People* v. *Reeder* (1976) 65 Cal.App.3d 235, 241 [135 Cal.Rptr. 421] [expert testimony].)

We do not, however, believe that the court's failure to reinstruct the penalty jury is reversible error. Having heard no instructions or argument to the contrary, we think it likely that the jury would consider its prior instructions applicable to penalty phase evidence.[34] (See *People* v. *Babbitt* (1988) 45 Cal.3d 660, 717-718 [248 Cal.Rptr. 69, 755 P.2d 253]; *People* v. *Gates, supra*, 43 Cal.3d 1168, 1209.) In any case, we find no reasonable possibility that the giving of explicit instructions at the close of the penalty trial might have resulted in a different verdict.

 2. At the penalty trial defendant requested an instruction that "in this part of the trial the law permits you to be influenced by mercy, senti- ment, and sympathy—but not prejudice or public opinion—in arriving at the proper penalty in this case." He argues that the court erred in rejecting the instruction.

Essentially the same issue arose in *People* v. *Williams* (1988) 45 Cal.3d 1268, 1322 [248 Cal.Rptr. 834, 756 P.2d 221], in which the defendant claimed the court erred in refusing to instruct that " '[y]ou may consider pity, sympathy, and mercy in deciding the appropriate penalty; however, your opinion may not be governed by guessing, prejudice, or public opinion . . . .' " Our opinion held that the trial judge could properly refuse the instruction because it could be "understood by the jurors as permitting them to indulge in sympathy unrelated to any of the evidence adduced at trial." (*Ibid.*; see *California* v. *Brown* (1987) 479 U.S. 538, 542 [93 L.Ed.2d 934, 940, 107 S.Ct. 837].)

 3. During the guilt and penalty trials the jury heard direct evidence of some other crimes committed by the defendant. Expert witnesses and character witnesses referred to still other crimes. The trial court instructed the jury on the elements of those crimes which the prosecutor planned to argue as aggravating factors, told them not to consider those crimes unless

[34] Defendant points out that the court gave CALJIC No. 17.31, which tells the penalty jury that they have been provided with the applicable law for arriving at the penalty verdict. We do not, however, believe the jury would interpret this instruction as directing them to disre- gard the guilt phase instructions on evaluation of evidence.

proved beyond a reasonable doubt, and instructed that "you may not consider any evidence of any other criminal activity as an aggravating circumstance." It also instructed the jury that "you shall consider all of the evidence which has been received during any part of this case." ▮ Defendant contends that the two instructions are inconsistent. We think the jury would understand the specific instruction not to consider as aggravating factors those crimes which the prosecutor did not attempt to prove beyond a reasonable doubt as qualifying the general instruction to consider all the evidence, and hence find no instructional error.

▮ 4. The court's guilt phase instructions defined reasonable doubt. The court did not repeat this instruction at the penalty phase. We believe, however, that the jury would reasonably understand that the definition given at the guilt phase applied equally to the penalty phase.

▮ 5. Defendant asked the court to instruct the jury that each aggravating circumstance as well as the preponderance of aggravation over mitigation must be proved beyond a reasonable doubt. The court correctly rejected this instruction. (*People* v. *Frierson* (1979) 25 Cal.3d 142, 180 [158 Cal.Rptr. 281, 599 P.2d 587] [1977 death penalty law]; *People* v. *Rodriguez*, *supra*, 42 Cal.3d 730, 777-779 [1978 law].)

▮ 6. Defendant contends that the trial court erred in failing to delete inapplicable mitigating factors when it read the factors which the jury should consider in determining which penalty to impose. We rejected this contention in *People* v. *Melton*, *supra*, 44 Cal.3d 713, 770; *People* v. *Miranda*, *supra*, 44 Cal.3d 57, 104-105, and in numerous other cases.

7. This case was tried before our decision in *People* v. *Brown*, *supra*, 40 Cal.3d 512, and the trial court instructed the jury, in conformity with the then-applicable provisions of CALJIC No. 8.84, that after considering the applicable aggravating and mitigating circumstances, "[i]f you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without possibility of parole."

In *Brown*, *supra*, 40 Cal.3d 512, we recognized that this instruction—which tracked the language of section 190.3—was potentially confusing and could mislead the jury with respect to its determination of penalty. Among our concerns was the fear that the instruction might lead jurors to the mistaken belief that once they determined that circumstances in aggravation outweighed mitigation, they were compelled to return a death verdict, even if they did not believe that punishment appropriate on the facts of the

case. (See, e.g., *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276-1277 [232 Cal.Rptr. 849, 729 P.2d 115].)

Because of the potentially misleading nature of the instruction, we held that in reviewing cases tried before *Brown* we would review the record to determine "whether . . . the sentencer may have been mislead to defendant's prejudice about the scope of its sentencing discretion . . . ." (*Brown, supra,* 40 Cal.3d at p. 544, fn. 17.) ▓▓ Defendant here contends that the prosecutor's repeated emphasis on the apparently mandatory language of the instruction—"shall impose a sentence of death"—misled the jury to his prejudice.

The Attorney General first responds by asking us to overrule *Brown.* That decision, he claims, was mistaken in its assertion that the California law might be unconstitutional if construed to leave the jury no discretion but to return a death verdict whenever it found circumstances in aggravation outweighed mitigation (see 40 Cal.3d at p. 540). Two recent five-to-four United States Supreme Court decisions show that while the issue was close and unsettled when *Brown* was decided, it is now reasonably clear that a law so limiting the jury's discretion is still within constitutional bounds. (*Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190]; *Blystone* v. *Pennsylvania* (1990) 494 U.S. 299 [108 L.Ed.2d 255, 110 S.Ct. 1078].) The Attorney General argues that we should reconsider *Brown* in light of those decisions.

We called for briefing and argument on this question in *People* v. *Gonzalez* (1990) 51 Cal.3d 1179 [275 Cal.Rptr. 729, 800 P.2d 1159], but ultimately concluded that it was not necessary to reconsider *Brown,* and decided the case under *Brown*'s analytical method. (51 Cal.3d at p. 1231, fn. 30.) We follow the same approach here.

We find no reasonable likelihood that the jury in this case was misled into an incorrect understanding of its function. We quote the portion of the prosecutor's argument which bears on this point. He told the jurors: "There are, I think, 11 separate factors that you will be directed by the court to consider in making your decision. The court will also tell you the test to be applied. Because essentially what you are doing is you are saying is this the kind of case which society has provided the death penalty for? Applying rules given to me, is this the case that warrants the death penalty?

"There is no burden of proof. If you find the aggravating factors to outweigh, merely outweigh, the mitigating factors, the death penalty is the decision you should return; and, conversely, if you find the mitigating factors outweigh the aggravating factors, life without parole.

"Notice the language [of the court's instruction] is not you 'may' consider and you 'may' be guided. This instruction tells you that you 'shall.'

"It is hoped that we can produce some predictability into the process of applying punishment, and it is thought if your discretion is guided, that predictability is brought into the process and that's what it is sought for."

There is some problematic language here, including the prosecutor's assertion that the death penalty is required if aggravation "merely outweighs" mitigation. (See CALJIC No. 8.88; *People v. Brown, supra*, 40 Cal.3d 512, 545, fn. 19.) But the thrust of the prosecutor's argument was not that the penalty determination follows a mechanical or arithmetical model, but instead involved the exercise of guided discretion to determine whether the case at hand is the kind of case which warrants the death penalty. The argument as a whole was consistent with the function of the jury as described in *Brown*.

K. *Prosecutorial argument.*

1. In his closing argument the prosecutor discussed the list of aggravating and mitigating factors under section 190.3. He argued that factors (a) through (c)—the circumstances of the crime, prior violent crimes, and prior felony convictions—were aggravating. He maintained that under factor (d) the absence of extreme mental or emotional disturbance was aggravating. He turned to factor (e), whether the victim is a willing participant, and argued that this is an aggravating factor as well.

At this point defense counsel objected, and the following exchange ensued

Mr. Small (defense counsel): "I don't think that Mr. Webster's statement that that is an aggravating factor is correct. If this is not a circumstance the trier of fact believes is present in this case, it is not something they should consider. If it is not something they should consider, it is not necessarily an aggravating circumstance."

The court: "It is true that these victims were not willing participants. Whether or not it's an aggravating factor is for the jury to decide based upon the instructions of law that will be given to them by the court."

Mr. Webster (prosecutor): "As I read that it says whether or not the victim was a participant. And it seems to me that if he was a participant, that is a mitigating factor; if he is not a willing participant, if in fact he fights death with every inch of his being, that is an aggravating factor. And that is for you to decide."

Mr. Small: "Your honor, I don't believe that's a correct characterization of the law."

The court: "Overruled."

The prosecutor went on to assert, over defense objection in each instance, that the absence of evidence of moral justification for the killing rendered section 190.3, factor (f), an aggravating circumstance, that the absence of evidence of duress rendered factor (g) aggravating, that the absence of evidence that defendant lacked capacity to conform to legal requirements rendered factor (h) aggravating, and that under factor (i) defendant's age (45) was another aggravating consideration. Addressing factor (j), whether the defendant was an accomplice, the prosecutor told the jury that "you know the facts" and can decide whether that aggravates or mitigates.

The prosecutor discussed section 190.3, factor (k)—any other circumstance which extenuates the gravity of the crime. After asserting there were no such circumstances, he went on to set out the DSM III diagnostic standards for sociopathy, and reviewed the evidence at length to show that defendant's conduct conformed to those standards. The prosecutor did not expressly assert that factor (k) was an aggravating consideration, but defendant claims his argument went beyond merely showing the absence of mitigating considerations.

The trial court should have sustained defendant's objections. As we explained in *People v. Rodriguez, supra,* 42 Cal.3d 730, "the purpose of 'aggravating' and 'mitigating' factors is to assess the seriousness of a capital crime in relation to others of the same general character. The mere absence of a mitigating element may weigh against a finding that the instant offense is less serious than 'normal,' and thus especially deserving of mercy, but it does not suggest that the crime is *more* serious than 'normal,' and thus especially deserving of death. Indeed, '[s]everal of the statutory mitigating factors are particularly unlikely to be present in a given case . . . . To permit consideration of the absence of these factors as aggravating circumstances would make these aggravating circumstances automatically applicable to most murders.' " (Pp. 788-789, quoting *People v. Davenport, supra,* 41 Cal.3d 247, 289.) In short, a murder is not an aggravated one, especially deserving of death, because the victim did not willingly participate or because the killer acted without duress or moral justification. The prosecutor's argument improperly weighted the penalty calculation in favor of a death verdict.

The question is whether it is reasonably possible that the outcome of the penalty trial would be different if the trial judge had sustained defendant's objections. (*People v. Brown, supra,* 46 Cal.3d 432, 448.) Taking into ac-

count the weight of the aggravating evidence—not only the murder convictions, but defendant's many prior convictions for assault and robbery—and the relative weakness of the case in mitigation, we find no reasonable possibility that the verdict was affected by the court's error.

2. As we have noted, the prosecutor argued that defendant was a sociopath, and that sociopaths are dangerous and incurable. ■■■ Defendant maintains that this argument is inconsistent with our decision in *People* v. *Murtishaw, supra,* 29 Cal.3d 733, 773, where we rejected the use of expert testimony to predict that the defendant would commit violent crimes. In *People* v. *Davenport, supra,* 41 Cal.3d 247, 288, however, we found similar prosecutorial comment proper because it was "not based on inadmissible evidence of expert testimony predicting future dangerousness." We have previously concluded that the expert testimony on which the prosecutor relied here was admissible. (See part IV.H, *ante.*) There is no misconduct in comment based upon properly admitted expert and character evidence.[35]

3. The prosecutor told the jury that there is no burden of proof at the penalty trial. He was correct. (See part IV.J, *ante.*) ■■■ It is true, as defendant points out, that to return a death verdict the jury must be persuaded that aggravation so outweighs mitigation that such a verdict is warranted (see *People* v. *Brown, supra,* 40 Cal.3d 512, 545, fn. 19), but neither the prosecution nor the defense has the burden of proof on that issue.

4. As we previously have noted (*ante,* pp. 885-886), the court instructed the jury that it could consider certain crimes as aggravating if proved beyond a reasonable doubt, but that it should not consider in aggravation evidence of any other crimes. ■■■ Defendant claims that the prosecutor, contrary to the court's instruction, asked the jury to consider as aggravating crimes for which defendant had not been convicted, and which were not mentioned in the court's reasonable-doubt instruction. Defendant also assigns as misconduct a number of other statements in the prosecutor's argument:

(a) "It would be difficult to separate or define a case more deserving of the death penalty than this particular case."

(b) "A sociopath, especially a criminal sociopath, is a person who habitually commits crimes. They're frequently the worst criminals that we deal with in the criminal justice system."

---

[35] Defendant contends that the prosecutor's comments went beyond the evidence, but that contention is barred by his failure to object. (See *People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].)

(c) "They [(the police)] should have shot him in 1977, ladies and gentlemen. That's what they should have done. You don't have to have a gun pointed at you and take it in our society."

(d) "He's got 18 separate violent felonies on different victims. That's amazing. That is amazing."

(e) "In the most recent Penal Code, . . . they have finally recognized the vengeance is something, or retribution is something legitimate in California. That it is not wrong to feel good when someone gets their just deserts."

We take no position on whether any of these statements constitute improper argument, because defendant's contentions are barred under *People v. Green, supra,* 27 Cal.3d 1, by his failure to make a timely objection in the trial court.

*Green* itself involved the failure to object to improper argument at the guilt trial, but we have frequently applied it to failure to object to penalty phase argument. (See, e.g., *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1104 [259 Cal.Rptr. 630, 774 P.2d 659]; *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 788.) Defendant contends that we have erred in so doing. He argues that the trial court has a duty, arising from the state's independent interest in a reliable verdict, to protect against the danger that a verdict is the product of improper argument whether or not defendant objects.

Defendant already is protected, however, by his right to competent assistance of counsel. Competent counsel can be expected to object to argument which is not only erroneous but so prejudicial that it would undermine confidence in the verdict. If counsel fails to object, and lacks a reasonable tactical basis for the failure to object, a defendant if prejudiced would be entitled to a new trial on the theory that he had been denied the effective assistance of counsel. (See *People* v. *Ledesma* (1987) 43 Cal.3d 171 [233 Cal.Rptr. 404, 729 P.2d 839].)

The *Green* rule serves the salutary purpose of encouraging objections at trial when the trial court can easily correct the harm. (See *Green, supra,* 27 Cal.3d 1, 27.) It also makes it unnecessary for an appellate court to rule upon the propriety of prosecutorial comments when no one contends that counsel's failure to object demonstrates incompetence. We conclude that the *Green* rule should continue to govern the review of claims of improper argument at the penalty phase.

This brings us to defendant's contention that his counsel's failure to object to the cited statements in the prosecutor's argument shows that

defendant did not receive constitutionally adequate representation. The argument fails on two grounds. First, there is nothing in the appellate record to show that counsel's actions were not the product of reasoned tactical choice. Second, in light of the totality of the argument and evidence, we find no reasonable probability (see *Strickland* v. *Washington, supra,* 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698]) that if counsel had objected, the outcome of the penalty trial would have been different.

L. *The jury's question concerning changes in the law.*

During the penalty deliberations the jury asked the judge, "Can the law be changed if Jackson Daniels was given life without possibility of parole?" The judge conferred with counsel and decided to tell the jury that both a verdict of life without possibility of parole and a verdict of death could be changed. When he called in the jury, however, the judge first answered another question. Reminded of the last question, he said, "I'm almost reluctant to answer that question." The foreperson responded, "If answering the final question will present any problems, we respectfully withdraw the question." The judge said, "All right. I'll not answer it then."

Defendant argues that the court should have realized that the jury had been speculating on the possibility of changes in the law, and should have instructed them sua sponte not to consider such matters. But more is required for reversible error. The judge did not instruct erroneously, did not refuse to answer any question the jurors wanted answered, and did not refuse to give any instruction requested by the defendant. A judge may infer from a jury's question that the jurors are engaged in improper speculation and try to head it off by a sua sponte instruction, but in light of the jury's withdrawal of their inquiry concerning changes in the law, we do not believe he had a duty to do so.

M. *Ruling on the motion to modify the verdict.*

Section 190.4, subdivision (e), provides that in every case in which a death verdict is returned, the defendant is deemed to apply for modification of the verdict. The trial judge explained his reasons for denying that motion. After reviewing the evidence, he said, "I'll find that the offense was not committed while the defendant then was under the influence of extreme mental or emotional disturbances. There was no moral justification or extenuation for his conduct and he did not believe there was any. He was not acting under extreme duress or under the substantial domination of another person. And he certainly had the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. [¶] Consider the age of the defendant, in his mid-forties. Considering all of

these [factors], it's obvious that the aggravating circumstances outweigh the mitigating circumstances."

Defense counsel asked: "Does the court find that the age was an aggravating circumstance? The judge replied: "The age is an aggravating circumstance. He's 45 years old. He certainly ought to have the maturity to avoid the type of conduct that he engaged in at his age." Counsel asked about mitigation, and the judge replied: "I really don't find any mitigation based upon the evidence presented because I have found that he is a person with few redeeming qualities and has very little to contribute."

■■■ Defendant contends that the judge, by treating neutral or inapplicable factors as aggravating, made the same mistake that the prosecutor made in his closing argument. (See discussion in part IV.K, *ante*.) But the judge's comments are not that clear. He did not say expressly that he considered the absence of mental disturbance, moral justification, duress, or inability to conform to legal requirements as aggravating considerations. His statement that "[c]onsidering all of these factors" the aggravating circumstances outweigh the mitigating could be true even if he viewed these factors as inapplicable. And the judge's comments on age suggest that what he considered aggravating was defendant's relative maturity, not his age as such. (See *People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052].)

In any event, past decisions have held that a remand is unwarranted when "[t]he statement of decision makes apparent that the [trial] court did not deem the issue of penalty to be a close one." (*People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1187 [259 Cal.Rptr. 701, 774 P.2d 730]; see *People* v. *Brown, supra*, 46 Cal.3d 432, 462.) The trial judge in the case before us reviewed the extensive aggravating evidence, especially defendant's lengthy criminal history, and found little or nothing in mitigation. It is apparent that he did not consider the penalty issue to be a close one that might hinge upon the classification of the statutory factors.

Finding no reversible error, we affirm the judgment and penalty imposed by the superior court.

Lucas, C. J., Mosk, J., Panelli, J., Kennard, J., Arabian, J., and Eagleson, J.,* concurred.

Appellant's petition for a rehearing was denied February 20, 1991.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.